(47 Misc. Rep. 7.)

CITY TRUST, SAFE DEPOSIT & SURETY CO. OF PHILADELPHIA v.
WALDHAUER.

(Supreme Court, Trial Term, New York County. April, 1905.)

1. CONTRACT—PUBLIC POLICY—RESTRAINT OF TRADE.

Where master employers form an organization to secure stability in the building trades by obtaining an agreement with their employès for arbitration, instead of sympathetic strikes, it is not unlawful.

2. INDEMNITY—ACTION ON BOND—EVIDENCE.

Defendant, representing an association of roofers and sheet metal workers, joined the Building Trades Employers' Association, and gave a surety company a bond in favor of the association to obey its regulations and orders. The governor of the association, endeavoring to so arrange as to strikes in the building trades that building would go on with some certainty, arranged with the men entering their employment to sign an agreement to arbitrate their differences, and sent to each member of the association a resolution that no members should employ any roofers and sheet metal workers until further notice. Defendant, upon receiving a copy, laid off his men for three weeks, when he took them back without the consent of the association, and without asking them whether they had signed the arbitration agreement, and the association demanded payment of the surety on his bond because thereof. *Held*, in an action by the surety company against defendant on the bond and on the indemnity agreement to keep the surety harmless, plaintiff was entitled to judgment for the $500 which it had paid, with reasonable attorney's fees.

Action by the City Trust, Safe Deposit & Surety Company against Frederic Waldhauer. Judgment for plaintiff.

Frederic J. Swift, for plaintiff.
H. C. Bachrach, for defendant.

CLARKE, J. Plaintiff is a surety company. On June 26, 1903, the defendant applied to plaintiff for a bond in the sum of $500 in his own behalf and in favor of the Building Trades Employers' Association. Defendant's application contained an indemnity agreement whereby he agreed to faithfully, fully, and strictly comply with all the terms and conditions of said bond, and "to keep harmless the company from and against all suits, * * * loss, damages, etc., which the company shall or may at any time sustain in consequence of having given the said bond, and to pay to the company all damages for which the company shall become responsible upon said bond before the company shall be compelled to pay the same, and to pay all costs and expenses, including counsel fees, which the company may incur in investigating any claim made under said bond or in defending any suit commenced upon said bond." Upon such application and indemnity agreement the plaintiff, as surety, with defendant, as principal, did on the 26th of June, 1903, issue its bond on behalf of defendant and in favor of the Building Trades Employers' Association and Charles L. Eidlitz, as president thereof, and the individual members thereof in the sum of $500. Said bond contains the following:

"Whereas, as the aforesaid principal has been admitted as a representative member of the Building Trades Employers' Association, one of the said obligees, upon his agreement and stipulation, herein and hereby evidenced, that

he will obey and execute all decisions, orders, prohibitions, and regulations of the board of governors of said Building Trades Employers' Association, given in pursuance and made under the authority of the constitution and by-laws of said association, immediately upon service upon him of a copy of the same duly certified by the secretary of said association, and also upon the execution and delivery of this undertaking to said association, to pay to said obligees the sum of $500 for liquidated damages to said obligees, by reason of any noncompliance of said principal with said agreement and stipulation: Now, therefore, the condition of this obligation is such that if the said principal shall duly and faithfully obey and execute any and all such decisions, orders, prohibitions, and regulations of said board of governors of the said Building Trades Employers' Association, given in pursuance and under the authority of the constitution and by-laws of said association, then this undertaking shall be void; otherwise, to remain in full force and effect. This undertaking is issued upon the express condition that upon due proof to the said surety that the said principal, after service upon him of a copy of any decision, order, prohibition, or regulation, has been declared to be in default thereof by said board of governors, and has, upon demand, failed to pay to said obligees the amount of this undertaking, then within 30 days after receiving notice of said service and default the said surety agrees to pay the full amount of this undertaking to said obligees as liquidated damages, which sum is herewith stipulated as liquidated damages, and not as a penalty by the said principal, the said obligees, and the said surety; and the surety and the said principal herewith waive all defenses they may have against the payment of said sum; and upon the further condition that, if any liability shall accrue on the part of the said surety by reason of this undertaking after settlement of the same, the said surety shall be subrogated to all rights and remedies which the said obligees would have against the principal in this undertaking, or any other person."

The Building Trades Employers' Association was an unincorporated association composed of employers of labor in the building trades. As expressed in its constitution:

"The objects of this association shall be to foster the interests of those engaged in the erection and construction of buildings and other structures, to reform abuses relating to the business of persons so engaged, to secure freedom from unjust and unlawful exactions, to obtain and diffuse accurate and reliable information as to all matters affecting such persons, to procure uniformity, harmony, and certainty in the relations existing between employers, employès, mechanics, and laborers, and in all lawful ways to promote and protect the business interests of the members of this association; but there is no intention, nor shall there be any action on the part of this association, to control or in any way deal with prices or restrict competition."

The defendant belonged to this association as a representative member; that is, he belonged to the association of "roofers and sheet metal workers," which said association was represented by three representatives upon the board of governors of the Building Trades Employers' Association. Said board consisted of 60 such representatives, three from each of 20 different employers' associations. The powers of the board of governors, as defined in the constitution, are as follows:

"The board of governors shall at the request of any constituent association have power to decide all controversies, difficulties, and differences arising between the members of its association and their employès, to determine and regulate the conduct of the members of this association relative to such controversies, difficulties, and differences, to decide all disputes and disagreements arising between employers' associations represented on the board of governors and employès' organizations, also all controversies, difficulties, and differences arising between different employers' associations represented

on the board, and to determine, regulate, and control the conduct of such employers' associations relative to such disputes, difficulties, and differences, and generally to determine, regulate, and control the conduct of the members of this association and the employers' associations represented on the board in all matters pertaining to their relation with their employés, or in any and all matters affecting the building industry or the business interests in such building interest of the members of this association, and for such purposes to make general rules and regulations. The decisions, orders, prohibitions, and regulations of the board of governors shall be final and obligatory upon each and every member of this association, and shall be complied with, obeyed, and observed in good faith by every member. The board may suspend or expel members of this association for cause by the same quorum and vote as is required to order a cessation or resumption of work."

The constitution contains this provision:

"When the question of ordering a cessation or resumption of work by any or all of the members of the association is before the board, representatives from not less than 75 per cent. of the associations represented on the board shall constitute a quorum, and to order a cessation or resumption of work at least four-fifths of the vote must be in favor of such an order."

Also this:

"In order to insure the compliance with and obedience to the decisions, orders, prohibitions, and regulations of the board of governors, all represented and individual members shall give bonds to this association."

In the summer of 1903 there was a widespread strike in the building trades in the city of New York. The Building Trades Employers' Association attempted to get the situation in such shape that building would go on with some degree of certainty. In carrying out that object the board of governors made arrangements by which men entering the employment of the members of the association should agree to sign an arbitration agreement, which provided that they would arbitrate all their differences and would not go out on sympathetic strikes. A great many of the roofers, sheet metal workers, roof tilers, and slaters had signed this arbitration agreement. In order to further this policy, and at the request of the Association of Sheet Metal Employers, a circular letter was issued on July 29, 1903:

"To the Members: You are hereby informed that the following resolution was unanimously adopted at a meeting of the board of governors, held to-day, and you will please govern yourselves accordingly: 'Resolved, that no member of the Building Trades Employers' Association shall employ any roofers, sheet metal workers, roof tilers, or slaters, and members having such men at work shall immediately lay them off until further notice'."

The president of the association testified that the resolution meant, and that the members understood, that said resolution did not apply to roofers, sheet metal workers, roof tilers, and slaters who had signed the arbitration agreement. The defendant received a copy of said order. He testified that, when he received it, he was engaged in the construction of the Morris High School, in the city of New York, public schools 123 and 130, Brooklyn, 15 houses in Third street, 42 houses for the Eastern Parkway Company, Brooklyn, and a great many other jobs—all under written contracts containing time limits and penalties; that, when he received this notice, he laid off the men; that he kept them off about

three weeks; that then the contractors for these schoolhouses sent him three days' notices, threatened him with penalties, and also to break the contract and get some one else to finish up the jobs; 'and that then he took the men back to work without the consent of the association, and without asking whether they had signed the arbitration agreement. It appears that this was reported to the board of governors, and on the 21st of August, 1903, written notice of the charge was sent to defendant, and he was notified to appear and make answer on the 24th. On the 24th defendant failed to appear, and, evidence having been taken, it was found that he had violated the order, and it was determined that he be expelled and his bond forfeited and the plaintiff notified. The plaintiff was notified in writing on August 26th that the bond had been ordered forfeited by the board of governors. On September 12th the board sent the proof of the regularity of its proceedings to the plaintiff, including a copy of a letter of September 2d to defendant, notifying him of the action of the board, and demanding payment of the sum of $500. Under date of September 16th the plaintiff notified the defendant in writing that the board of governors had sent the papers to it, and stated that, unless he should immediately pay it, would be compelled to bring suit. Defendant not having paid, the plaintiff sent on October 15th its check for $500 to the association. It is conceded that $100 is a reasonable counsel fee, and that the interest is $42, and this suit is brought by the plaintiff upon the indemnity agreement in the application, and upon the bond to recover $642.

Defendant moves to dismiss the complaint on the ground that the prohibition in the resolution was not within the fair import of the constitution of the association; that they were not such orders or directions as the defendant was bound to obey, and were in restraint of defendant's right to contract, and in restraint of trade and against public policy. Further, that, although the sum of $500 is set forth in the bond as the stipulated damages, it is in fact a penalty; no actual damages having been shown. The defendant of his own free will joined the association, subscribed to its constitution and by-laws, thereby promising to obey and be governed by their provisions, and gave a bond with surety so to do. The general purposes of the association were lawful and commendable. The object was mutual benefit. If successful, the benefit would extend to the community at large, whose interests were grievously affected by the general interference with building operations; the strike having nothing to do with wages or hours of labor. It has been many times held in this state that workingmen have the right to organize for the purpose of securing higher wages, shorter hours of labor, or improving their relations with their employers; that they have a right to strike—that is, to cease working in a body by prearrangement until a grievance is redressed—provided the object is not to gratify malice or inflict injury upon others, but to secure better terms of employment for themselves. A peaceable and orderly strike, not to harm others, but to improve their own condition, is

not in violation of law. National Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am, St. Rep. 648. The converse of that proposition must be equally true. If the workman may decline to work, the master may decline to employ. If the work- man may strike, the master may lock out. Whatever one man may do alone he may do in combination with others, provided they have no unlawful object in view. Therefore, if it be lawful for workmen to organize and to conduct a peaceable strike to improve their con- dition, it seems a natural corollary that masters may organize and conduct a peaceable lockout for the same purpose.

It is conceded in this case that there was no malice either towards the defendant or towards the employés in the lockout order. The sole object and intent was to secure peace and stability in this great industry by obtaining an agreement for the settlement of dif- ferences by peaceful arbitration, instead of by wasteful, irrational, so-called sympathetic strikes, which, as has been demonstrated by recent cases in the criminal courts of this state, might be used for far different purposes than the betterment of the strikers as a whole. I find, therefore, nothing unlawful in the combination of the employers in the association, nor in the order issued by its governing board, which defendant violated. In Curran v. Galen, 152 N. Y. 38, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, the language of the Court of Queen's Bench in Regina v. Rowlands, 17 Ad. & El. (N. S.) 671, is quoted with approval:

"The rights of workmen are conceded; but the exercise of free will and freedom of action, within the limits of the law, is also secured equally to the masters. The intention of the law is, at present, to allow either of them to follow the dictates of their own will with respect to their own actions and their own property; and either, I believe, has a right to study to promote his own advantage, or to combine with others to promote their mutual advantage."

In Sinsheimer v. United Garment Workers of America, 77 Hun, 215, 28 N. Y. Supp. 321, it was said that manufacturers have the right to lock out all operatives connected with a labor organization, because of demands made by it upon one of the manufacturers. Therefore the order was not unlawful.

Master Stevedores' Ass'n v. Walsh, 2 Daly, 1, was an action to recover a penalty by a corporation of which defendant was a mem- ber for the violation of a by-law or "pledge" to the effect that there should be no variation from the prices adopted by the association. The court said:

"In the present case the by-law was limited in its operation to the mem- bers composing the corporation, and is sought to be enforced against one who had voluntarily subscribed to it. * * * As individuals the master steve- dores might collectively enter into an agreement not to work under certain rates, and, when formed into a corporation, they could, as a corporate body, make a by-law of that nature, being one, in the language of the statute, 'to. promote the business and interests of the association.' If the by-law is one which it is in the power of the corporation to make, it has the power, also, to attach to it a penalty for the purpose of enforcing it. All who become mem- bers of the corporate body are bound by it, and, where the penalty is incurred, an action may be brought in the name of the corporation to recover it."

In the case at bar defendant not only subscribed to the constitution, but gave a bond. He must be held to his contract. As to the claim that the order disobeyed was not one contemplated by the constitution, or within the power of the board of governors to pass, the constitution expressly provides for a special quorum, "when the question of ordering a cessation or resumption of work by any or all of the members of the association." So far as restraint of trade is concerned, a lockout is no greater restraint than a strike, and yet the strike, per se, is not unlawful on that account. Plaintiff may have judgment for $642.

Judgment for plaintiff.