## EDELSTEIN v. GILLMORE et al. *

Circuit Court of Appeals, Second Circuit.
August 12, 1929.

Rehearing Denied September 26, 1929.

No. 345.

*Certiorari denied 50 S. Ct. 153, 74 L. Ed. —.

Justus Sheffield, of New York City (Paul N. Turner, Emily C. Holt, and Justus Sheffield, all of New York City, of counsel), for appellants.

Nathan Burkan, of New York City, for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above). It may be, as the appellee contends, that the resolution formally adopted by Equity did not contain the paragraph which excepts from its operation contracts between plaintiff and members of Equity made prior to October 9, 1928. However that may be, the District Judge has found that the defendants are not threatening to enforce the resolution with respect to such contracts. Hence the case involves no attempt by the defendants to induce fellow members of their association to repudiate existing contracts with plaintiff. We say nothing as to that. It involves only an attempt to control their future making of agreements with the plaintiff, and we shall deal with it on that basis.

By the resolution, members of Equity are to be subjected to discipline and possible suspension or expulsion, if they shall, after the specified date, secure an engagement in the legitimate and musical comedy fields through a personal representative in New York City or environs who has not been licensed by Equity. The consequences which would follow from suspension or expulsion are such as to make it practically certain that Equity members will not employ an unlicensed personal representative. To do business with them in the future, the plaintiff must therefore obtain a license; and to obtain a license he must agree that, if he contracts with members of Equity, he will do so on the terms specified in the permit, one of such terms, to which the most strenuous objection is made, being the requirement that he modify his outstanding contracts with members, if requested by them so to do, so that old contracts shall conform to the standards set up for the new. Thus Equity is endeavoring to obtain for all its members who use the services of a personal representative, either under new contracts or under old, uniform terms in respect to such important matters as maximum rate of compensation, duration of maximum contract term, and guaranty of twenty weeks' employment in each year. The defendants are aiding and abetting in this endeavor; and there is no doubt that it will succeed, unless a court of equity intervenes. Equally beyond doubt is the fact that the plaintiff's business will be affected. If he accepts new business from Equity members, he must take it on the prescribed terms, including the modification of existing contracts —a modification conditioned, it is true, but conditioned only on a request which would seem certain to be made. If he declines a permit, he may carry out his outstanding contracts with Equity members, but he must forego the writing of any new business with them.

■ Beyond doubt each individual member of Equity, acting independently, is legally privileged to refuse to employ Mr. Edelstein on any terms, or to offer to employ him on terms of the offerer's dictation. Fed. Trade Comm. v. Raymond Co., 263 U. S. 565, 573, 44 S. Ct. 162, 68 L. Ed. 448, 30 A. L. R. 1114. He may make his offer identical with the standards set up by Equity, and may include therein a requirement that Mr. Edelstein shall consent to modify an existing contract with him or with another. A refusal to deal on any other terms would violate no right of Mr. Edelstein; he is privileged to accept or to reject the offer, and the fact that he will lose the new business if he refuses to modify his existing contracts would be quite immaterial. The question is whether an actor is privileged to combine with fellow actors in refusing to deal except on these terms, when their concerted economic power is such as to present to plaintiff the alternatives of accepting the terms offered or losing his New York business in the legitimate and musical comedy fields. Here the motive with which the confederates act becomes a very important, if not the controlling, factor. The District Court says:

"In so far as the purpose is to deprive plaintiff of new business because he refuses to surrender old contracts, the primary object is to injure him."

■ With this we cannot agree. If a personal representative has outstanding with an Equity member a contract which provides, for example, a 15 per cent. commission, it is self-evident that he is subjected to the temptation to find employment for the old client rather than for a new one with whom he has contracted for only a 10 per cent. commission, regardless of the relative professional qualifications of the two. New clients will be at a disadvantage because of the old contracts. On the other hand, if the rate of commission is the same in both contracts but the new contract contains a guaranty of employment which the old one does not, the new client is likely to be favored in the matter of placement. Equity believes that it is advantageous to its members, and to the theatrical profession generally, to have all its members on an equality in respect to absence of favoritism on the part of a personal representative in securing employment on the legitimate and musical comedy stage. The evils of unregulated employment agencies (using this term broadly to include also the personal representative) are set forth in the defendants' affidavits and are corroborated by common knowledge. See dissenting opinion

of Mr. Justice Stone in Ribnick v. McBride, 277 U. S. 350, 48 S. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327. Hence the requirement that, as a condition to writing new business with Equity's members, old contracts with its members must be made to conform to the new standards, does not seem to us to justify an inference that the primary purpose of the requirement is infliction of injury upon plaintiff, and other personal representatives in a similar situation, rather than the protection of the supposed interests of Equity's members. The terms they insist upon are calculated to secure from personal representatives better and more impartial service, at uniform and cheaper rates, and to improve conditions of employment of actors by theater managers. Undoubtedly the defendants intend to compel the plaintiff to give up rights under existing contracts which do not conform to the new standards set up by Equity, but, as already indicated, their motive in so doing is to benefit themselves and their fellow actors in the economic struggle. The financial loss to plaintiff is incidental to this purpose. See Gill Engraving Co. v. Doerr, 214 F. 111, 120 (D. C. S. D. N. Y.).

Whether in their relations to personal representatives Equity members are to be deemed a combination of employers, as appellants contend, or a "labor union," as appellee insists, is a matter disputed. To us it appears that in fact the policy adopted is aimed at improving their position from both aspects; but whether they be viewed as employers or employees would seem to make no difference. Counsel agree that both employers and laborers may respectively organize to strengthen their bargaining power in the economic struggle, and that the legal principles applicable to each group are the same. The motive of benefit to the industrial group will often justify a collective refusal to deal with one who will not accede to terms which promote the interests of such group, whether it be composed of laborers or of employers. See Nat. Fireproofing Co. v. Mason Builders' Ass'n, 169 F. 259, 269, 26 L. R. A. (N. S.) 148 (C. C. A. 2); Nat. Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648; Bossert v. Dhuy, 221 N. Y. 342, 117 N. E. 582, Ann. Cas. 1918D, 661; Wilson v. Hey, 232 Ill. 389, 396, 83 N. E. 928, 16 L. R. A. (N. S.) 85, 122 Am. St. Rep. 119, 13 Ann. Cas. 82; Macauley Bros. v. Tierney, 19 R. I. 255, 33 A. 1, 37 L. R. A. 455, 61 Am. St. Rep. 770; Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319; Booker & Kinnaird v. Louisville

Board of Fire Underwriters, 188 Ky. 771, 224 S. W. 451, 21 A. L. R. 531. We think that that motive supplies justification in the instant case. Therefore, unless we must say that because of Equity's control over the supply of actors in New York City, it is illegal to exercise their combined power against the plaintiff by collective refusal to deal with him until he obtains a permit, we see no basis for the injunction. Whether the welfare of society requires the curtailment of economic power when the group which exercises it is in complete control of a particular industrial or commercial field would seem to be a problem more appropriate for the Legislatures than for the courts. But, in any event, no authority has been cited which appears to require us to hold illegal the threatened refusal of Equity's members to deal with plaintiff except upon the terms proposed. On the contrary, the cases most nearly in point sustain the appellants. See Tannenbaum v. N. Y. Fire Ins. Exch., 33 Misc. Rep. 134, 68 N. Y. S. 342; City Trust Co. v. Waldhauer, 47 Misc. Rep. 7, 95 N. Y. S. 222; Macauley Bros. v. Tierney, supra; Am. Livestock Comm. v. Chicago Livestock Exchange, 143 Ill. 210, 32 N. E. 274, 18 L. R. A. 190, 36 Am. St. Rep. 385; cf. Boutwell v. Marr, 71 Vt. 1, 42 A. 607, 43 L. R. A. 803, 76 Am. St. Rep. 746.

But the defendants did not merely notify their own members and persons engaged in the business of acting as personal representatives of the resolution adopted by Equity. They also notified managers and producers, and it is urged that they have gone beyond the legal pale by extending a boycott beyond their own union. The letter to Rufus R. Lemaire, a producer, requests that he refrain from hiring Equity members except through agents holding Equity permits, and continues:

"As you know our members cannot work with suspended members so you will readily see the importance of careful compliance with our request and, further, we shall be compelled to regard as unfriendly any action which tends to defeat this new and healthy policy.

"Thanking you for your earnest cooperation and with best wishes. * * * ".

And on October 8, 1928, a notice addressed "To all Producing Managers," contained the following:

"We are confident you will co-operate since the ultimate result will be as much to your advantage as to ours.

"The penalties we are attaching to those who break our rules are necessarily drastic.

"The actor will be Suspended.

"The Agent will lose his Permit.

"The Manager will have to get along without the services of our members."

If these communications were to be deemed a notification that managers were not to hire through plaintiff, until he secured a permit, an Equity member with whom plaintiff already had an outstanding contract, we do not say that they would be unobjectionable. That question we leave till it shall arise, and it is not now before us because the lower court found for the purpose of this injunction that old contracts were excepted from the resolution. Viewing the letters as referring only to hiring members with whom the plaintiff might contract after October 9th, we do not think it can be considered as an attempt to create a secondary boycott against plaintiff. It is a notification of a new ground for suspending or expelling Equity members and a calling of attention to the old rule which forbids members in good standing from working with suspended members. It is not an effort to coerce plaintiff's manager customers not to deal with him, as in Auburn Draying Co. v. Wardell, 227 N. Y. 1, 124 N. E. 97, 6 A. L. R. 901. Despite the phrase requesting co-operation, it really asks no action by producing managers to carry into effect the new rule. That is to be made effective solely by the disciplinary action of Equity upon its own members who violate it. From the managers nothing is expected but the observance of the old closed shop rule. In Cohn & Roth Electric Co. v. Bricklayers' Union, 92 Conn. 161, 101 A. 659, 6 A. L. R. 887, it was held that there was nothing unlawful in stating to contractors what would happen under the defendant union's rules, should the contractor employ nonunion men.

For the foregoing reasons we think the preliminary injunction was improvidently issued. Accordingly the decree is reversed.

MANTON, Circuit Judge, dissents.

On Petition for Rehearing.

SWAN, Circuit Judge. The foregoing opinion is predicated upon the premise that the defendants are threatening no interference with existing contracts of the plaintiff, except so far as the plaintiff voluntarily consents to modify them for the sake of obtaining new business from members of Equity. So the trial judge found, and so counsel for the defendants assert in their brief.

In his petition for rehearing, the plaintiff expresses fear that, upon dissolution of the preliminary injunction, the defendants

will change their attitude and will construe Equity's letters (referred to in the opinion) as instructions to producers and managers not to employ through plaintiff any member of Equity, even though such member is under an existing contract with plaintiff, unless plaintiff shall take out a permit. We do not regard such fears as sufficiently well founded to justify a reargument or the present issuance of an injunction. Should defendants hereafter threaten interference with existing contracts, otherwise than by endeavoring to induce a voluntary modification through the refusal of new business from members of Equity until plaintiff obtains a permit, there is nothing in our decision to prevent plaintiff from then applying to the court for injunctive relief.

The petition for rehearing is denied.