**H. A. ARTISTS & ASSOCIATES, INC., et al., Plaintiffs-Appellants,**

v.

**ACTORS EQUITY ASSOCIATION, an unincorporated association, and Donald Grody, Defendants-Appellees.**

No. 875, Docket 79–7821.

United States Court of Appeals, Second Circuit.

Argued March 14, 1980.

Decided May 23, 1980.

Howard Breindel, New York City (Bowditch & Dewey, Worcester, Mass., Solin & Breindel, New York City, of counsel), for plaintiffs-appellants.

Nan Bases, New York City (Cohn, Glickstein, Lurie, Ostrin, Lubell & Lubell, New York City, of counsel), for defendants-appellees.

Shea & Gould, New York City, for amicus curiae, Screen Actors Guild, Inc.

Mortimer Becker, New York City (Van Arkel, Kaiser, Gressman, Rosenberg & Driesen, Washington, D.C., of counsel), for amicus curiae, Am. Federation of Television and Radio Artists.

Before LUMBARD, MANSFIELD, Circuit Judges and BARTELS, District Judge.*

LUMBARD, Circuit Judge:

Appellants, theatrical agents who act as intermediaries between actors and producers, appeal from a judgment of the District Court for the Southern District of New York, 478 F.Supp. 496 (1979) (Motley, J.), holding certain practices of defendant union Actors Equity ("Equity") immune from challenge under the antitrust laws because protected by the "statutory labor exemption." We affirm.

At issue in this case is Equity's system of "franchising" theatrical agents. Agents pay a fee and agree to abide by certain restrictions in return for certification as "franchised" agents. Equity encourages agents to become franchised by forbidding its members to deal with unfranchised agents. Equity members who negotiate contracts using the services of unfranchised agents are subject to union discipline, including fines.

The most important of the restrictions placed upon franchised agents is the requirement that they renounce any right to take commissions on contracts under which an actor receives scale wages. Scale wages are set by a collective bargaining agreement between Equity and theatrical producers, to which the agents are not parties. To the extent that a contract includes provisions under which an actor will sometimes receive scale pay (as for rehearsal periods and "chorus" employment) and sometimes more, the franchise regulations deny the agent any commission on the scale portions of the contract. Franchised agents are also precluded from taking commissions on certain expense money paid to union members; commissions are limited on wages within 10% of scale pay; and agents must allow actors to terminate a representation contract if the agent is unsuccessful in procuring employment for the actor within a specified period of time.

Some theatrical agents find this system acceptable, and this group—which has formed a trade association called TARA—is not a party in this litigation.

The district court did not reach the question of whether or not the franchise system is an unreasonable restraint of trade, or constitutes *per se* illegal price-fixing, because it found that the union's actions in creating and maintaining the franchise system were fully protected by the "statutory" labor exemption from the antitrust laws, which removes from antitrust scrutiny unilateral action by a labor union pursuing the interests of its members. The "statutory" exemption has its source in judicial readings of sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52 and of the Norris-LaGuardia Act, 29 U.S.C. §§ 105–115. Under the leading "statutory"

---

* Hon. John R. Bartels, United States District Judge for the Eastern District of New York, sitting by designation.

labor exemption case of *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the threshold issue is whether or not Equity's franchising of agents has involved any combination between Equity and any "non-labor groups" or persons who are not "parties to a labor dispute." *Id.* at 232, 61 S.Ct. at 466. If it has, the protection of the exemption does not apply.[1]

Most employers qualify as a "non-labor group,"[2] and the court below considered whether or not there was any agreement, either explicit or tacit, between Equity and the producers to establish or police the franchise system. We do not believe the district court was clearly erroneous in finding that the collective bargaining agreement does not reveal any combination between Equity and the producers with respect to agents, Fed.R.Civ.P. 52(a), *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 694, 85 S.Ct. 1596, 1604, 14 L.Ed.2d 640 (1965).

Appellants argue that the provision in the collective bargaining agreement that standard employment contracts include a space for the actor's agent's name, and another provision of the agreement that requires this line to be filled in, is evidence that the producers agree with Equity to help the union police its franchise system. We disagree. As the district court found, there was evidence that contracts were often executed leaving blank the line left for the agent's name, and that, even so, Equity honored such contracts and did not take any action against members who worked under such contracts. The provision requiring that every line be filled in far antedated the appearance of the line for "name of agent." The district court was not clearly erroneous in concluding that Equity did not in fact require that this line be filled in.

The collective bargaining agreement aside, appellants argue that various statements made by Equity officials to union members and to producers are evidence of a combination between Equity and the producers with regard to agent franchising. We have examined each of the statements in the record adduced to support this point and we conclude that the district court's finding that they do not demonstrate any such combination cannot be labeled clearly erroneous. Unilateral pronouncements by Equity such as that "only franchised agents may negotiate employment deals for Equity performers" are not proof of an agreement because they may mean no more than that Equity members are forbidden from dealing with unfranchised agents. Such a prohibition, of course, since it serves the union's self-interest in a matter of proper union concern and does not involve a non-labor group, is safe from antitrust scrutiny under the statutory exemption. *United States v. Hutcheson, supra.*

There is some evidence in the record that Equity sought the producers' cooperation in enforcing the franchise system during the 1975 negotiations between Equity, TARA and the producers. And Equity officials did tell their membership that producers had an "obligation" to avoid using unfranchised agents. But such unilateral expressions, in the absence of any indication from the producers that they had agreed to cooperate or that they had accepted Equity's view of their "obligations," is not evidence from which the court was required to find that a "combination" had been formed. Our conclusion is also based on the fact that there was no evidence at trial that any producer had considered himself bound by the union's statements; nor did any producer testify

1. If a court finds that there has been an agreement between a union and a "non-labor group", the agreement may still be entitled to antitrust immunity under the "non-statutory" exemption. *Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). Since both the "statutory" and "non-statutory" exemptions are based on judicial readings of the Sherman, Clayton and Norris-LaGuardia Acts, this

choice of terminology seems unfortunate. *See* I Areeda & Turner, *Antitrust* (1978) § 229 at 192.

2. An exception is an employer in job competition with his employees, *e. g.*, a bandleader who sometimes both leads a band and plays an instrument. *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1967).

that he had been pressured not to deal with unfranchised agents, or that he had reported unfranchised agents to the union.

■ But on the record in this case we discern a combination between the union and individuals who appear as if they might be members of a "non-labor" group. These individuals are those agents who have agreed with the union to become franchised, and these agreements must be scrutinized to determine if they are agreements that would divest Equity's franchise system of the protection of the "statutory" exemption. In our view, they do not because the agents involved are a "labor group."

In *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1967), the Supreme Court identified the test for distinguishing a labor group from a non-labor group as ". . . the presence of job or wage competition or some other economic inter-relationship affecting legitimate union interests between the union members and the independent contractors. If such a relationship existed, the independent contractors were a 'labor group' . . . ." 391 U.S. at 106, 88 S.Ct. at 1567, quoting 241 F.Supp. at 887. The above language is taken from the *Carroll* court's discussion of whether or not bandleaders in the "club date" field could be subjected to certain forms of union restrictions. Since the central holding in the case was that the fact that bandleaders sometimes performed as musicians meant that such restrictions were valid, most of the opinion deals with the "job or wage competition" branch of the disjunctive test quoted above. But the *Carroll* court also approved the musicians' union's restrictions on booking agents' commissions, which were enforced through a "licensing" system analogous to the "franchising" system at issue in the case at bar. 391 U.S. at 116–17, 88 S.Ct. at 1572–73.

Unlike the bandleaders, the agents in *Carroll* were not in any kind of "job or wage competition" with union members. The court's *sub silentio* application of the statutory exemption therefore supports the view that the musicians and the booking agents were in a sufficient "economic interrelationship" to justify union regulation. Because of the vagueness of this term, however, we believe the matter calls for further explanation.

Most unions are in an "economic interrelationship" with the employers of their membership. When the union gains a wage increase, the employers give up corresponding amounts of money (though not necessarily corresponding profits, because labor costs can often be passed along to consumers). But such an "economic interrelationship" does not suffice to make an employer a "labor group", or even a "party to a labor dispute"; otherwise there would be no need for the "non-statutory" exemption, which was developed largely to provide an exemption for union agreements with employers. *Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). To choose a different example, there is an "economic interrelationship" between a labor union and the buyers of goods produced by the union members' employer. If, for example, steelworkers were to win a wage raise of enormous size, various users of steel products, such as automobile manufacturers, would be adversely affected. Yet a combination between the steelworkers and an automobile manufacturer would not be entitled to the benefit of the statutory exemption because of this "economic interrelationship."

■ For purposes of this case, it is enough to note that the "economic interrelationship" test has never been used to immunize from antitrust challenge anything more than a union's effort to regulate parties, who, because of industry structure, stand athwart the current of wages paid by employers to union members; and that these efforts have been associated with attempts to defend the integrity of *minimum* wages. *See, e. g., Adams, Ray & Rosenberg v. William Morris Agency*, 411 F.Supp. 403 (C.D.Cal.1976). In industries where it is necessary or customary for union members to secure employment through agents, and agents' fees are calculated as a percentage of wages set by a collective bargaining

agreement, such agents must be considered a "labor group" because the union cannot eliminate wage competition among its members without regulation of the fees of the agents.

Once it is determined that the union's actions have involved no combination with a non-labor group, it remains, under *United States v. Hutcheson, supra,* only to decide if the goal being pursued is within the area of the union's legitimate self-interest. In the case at bar, Equity, through its franchising system, seeks primarily to protect from encroachment a minimum wage in an industry where the maintenance of a minimum wage poses problems of particular intractability. The possibility that job-hungry actors will work through agents who take excessive commissions is a matter of legitimate union concern. The goal of the agent restrictions is the elimination of wage competition, traditionally one of the most sacrosanct goals of national labor policy.

To this point, we have been concerned with the core of Equity's franchising system—the securing by the union of an agreement from the agents not to charge commissions on certain types of work obtained. A second aspect of the franchising system, under which the union charges a fee to agents who become franchised, is more troublesome. These fees ($200 for the initial franchise; $60 per year thereafter for each agent, and $40 for any sub-agent working in the office of another), are not segregated from other union funds. While the union argues that they are necessary to pay the union's expenses in administering the franchise system, no evidence was presented at trial to show that the union's costs justified the franchise fees.

Clearly the union could not, legally, exact more from the agents than it needs to offset the costs of the franchising system. Such exactions would be unconnected with any of the goals of national labor policy which justify the antitrust exemption for labor. Nevertheless, this case in its present posture can best be disposed of by approving the fees as they stand today. There was testimony that at least one full-time Equity employee was engaged in updating lists of franchised agents and correlating contracts with these lists. There was also testimony that approximately 200 theatrical agents or agencies are affected by the union practices under challenge. Assuming an average yearly charge of $60, Equity's franchising revenues would amount to approximately $12,000. Such a sum, plus initial franchise fees collected during the year, cannot be incommensurate with Equity's expenses in maintaining a full-time employee to administer the system. In such circumstances, a remand to the district court would not serve any useful purpose.

AFFIRMED.