H. A. ARTISTS & ASSOCIATES, INC., ET AL. *v.*
ACTORS' EQUITY ASSN. ET AL.

No. 80–348.  Argued March 23, 1981—Decided May 26, 1981

STEWART, J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined, and in all but Part II–D of which BURGER, C. J., and BRENNAN and MARSHALL, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and MARSHALL, J., joined, *post*, p. 723.

*Howard Breindel* argued the cause for petitioners. With him on the briefs was *Charles Donelan.*

*Jerome B. Lurie* argued the cause for respondents. With him on the brief were *Sidney E. Cohn, Mary K. O'Melveny, Nan Bases,* and *Samuel Estreicher.*

*Laurence Gold* argued the cause for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance. With him on the brief were *J. Albert Woll* and *George Kaufmann.**

JUSTICE STEWART delivered the opinion of the Court.

The respondent Actors' Equity Association (Equity) is a union representing the vast majority of stage actors and actresses in the United States. It enters into collective-bargaining agreements with theatrical producers that specify minimum wages and other terms and conditions of employment for those whom it represents. The petitioners are independent theatrical agents who place actors and actresses in jobs with producers. The Court of Appeals for the Second Circuit held that the respondents'[1] system of regulation of theatrical agents is immune from antitrust liability by reason of the statutory labor exemption from the antitrust laws, 622 F. 2d 647.[2] We granted certiorari to consider the availability of that exemption in the circumstances presented by this case. 449 U. S. 991.

I

A

Equity is a national union that has represented stage actors and actresses since early in this century. Currently representing approximately 23,000 actors and actresses, it has collective-bargaining agreements with virtually all major theatrical producers in New York City, on and off Broadway,

---

*David Alter, Joseph Ferraro, Mortimer Becker, Henry Kaiser, Ronald Rosenberg,* and *Paul P. Selvin* filed a brief for the American Federation of Television and Radio Artists et al. as *amici curiae* urging affirmance.

[1] The respondent Donald Grody is the executive secretary of Equity.

[2] The basic sources of organized labor's exemption from federal antitrust laws are §§ 6 and 20 of the Clayton Act, 38 Stat. 731 and 738, 15 U. S. C. § 17 and 29 U. S. C. § 52, and §§ 4, 5, and 13 of the Norris-LaGuardia Act, 47 Stat. 70, 71, and 73, 29 U. S. C. §§ 104, 105, and 113.

and with most other theatrical producers throughout the United States. The terms negotiated with producers are the minimum conditions of employment (called "scale"); an actor or actress is free to negotiate wages or terms more favorable than the collectively bargained minima.

Theatrical agents are independent contractors who negotiate contracts and solicit employment for their clients. The agents do not participate in the negotiation of collective-bargaining agreements between Equity and the theatrical producers. If an agent succeeds in obtaining employment for a client, he receives a commission based on a percentage of the client's earnings. Agents who operate in New York City must be licensed as employment agencies and are regulated by the New York City Department of Consumer Affairs pursuant to New York law, which provides that the maximum commission a theatrical agent may charge his client is 10% of the client's compensation.

In 1928, concerned with the high unemployment rates in the legitimate theater and the vulnerability of actors and actresses to abuses by theatrical agents,[3] including the extraction of high commissions that tended to undermine collectively bargained rates of compensation, Equity unilaterally established a licensing system for the regulation of agents. The regulations permitted Equity members to deal only with those agents who obtained Equity licenses and thereby agreed to meet the conditions of representation prescribed by Equity. Those members who dealt with nonlicensed agents were subject to union discipline.

The system established by the Equity regulations was immediately challenged.[4] In *Edelstein* v. *Gillmore*, 35 F. 2d

---

[3] Such vulnerability was, and still remains, particularly acute for actors and actresses without established professional reputations, who have always constituted the overwhelming majority of Equity's members.

[4] The challenge was grounded on allegations of common-law tortious interference with business relationships.

723, the Court of Appeals for the Second Circuit concluded that the regulations were a lawful effort to improve the employment conditions of Equity members. In an opinion written by Judge Swan and joined by Judge Augustus N. Hand,[5] the court said:

"The evils of unregulated employment agencies (using this term broadly to include also the personal representative) are set forth in the defendants' affidavits and are corroborated by common knowledge. . . . Hence the requirement that, as a condition to writing new business with Equity's members, old contracts with its members must be made to conform to the new standards, does not seem to us to justify an inference that the primary purpose of the requirement is infliction of injury upon plaintiff, and other personal representatives in a similar situation, rather than the protection of the supposed interests of Equity's members. *The terms they insist upon are calculated to secure from personal representatives better and more impartial service, at uniform and cheaper rates, and to improve conditions of employment of actors by theater managers.* Undoubtedly the defendants intend to compel the plaintiff to give up rights under existing contracts which do not conform to the new standards set up by Equity, but, as already indicated, *their motive in so doing is to benefit themselves and their fellow actors in the economic struggle.* The financial loss to plaintiff is incidental to this purpose." *Id.,* at 726 (emphasis added).[6]

---

[5] Judge Manton dissented without opinion.

[6] For contemporary descriptions of agent abuses of actors and actresses, see generally A. Harding, The Revolt of the Actors (1929). See also New Rules for Actors, N. Y. Times, Sept. 24, 1928, p. 20, col. 3; The New Republic, Oct. 24, 1928, p. 263. Cf. *Ribnik* v. *McBride,* 277 U. S. 350, 359–375 (Stone, J., joined by Holmes and Brandeis, JJ., dissenting) (general abuses by employment agencies, particularly at times of wide-

The essential elements of Equity's regulation of theatrical agents have remained unchanged since 1928.[7] A member of Equity is prohibited, on pain of union discipline, from using an agent who has not, through the mechanism of obtaining an Equity license (called a "franchise"), agreed to comply with the regulations. The most important of the regulations requires that a licensed agent must renounce any right to take a commission on an employment contract under which an actor or actress receives scale wages.[8] To the extent a contract includes provisions under which an actor or actress will sometimes receive scale pay—for rehearsals or "chorus"

spread unemployment). The Court's decision in *Ribnik* v. *McBride* was overruled unanimously in *Olsen* v. *Nebraska,* 313 U. S. 236.

[7] The petitioners do not dispute this. The regulations have undergone revision in some details, largely as a result of negotiations between Equity and Theatrical Artists Representatives Associates (TARA), which until shortly before this litigation began was the only association voicing the concerns of agents with regard to their representation of Equity members. Until their voluntary resignation in late 1977, most of the petitioners were members of TARA. The petitioners are now members of the National Association of Talent Representatives (NATR). Unlike TARA, which functions only in the legitimate theater field, NATR also functions in the fields of motion pictures and television. In those fields, agents operate under closely analogous agent regulations maintained by the Screen Actors' Guild and the American Federation of Television and Radio Artists.

The history of the negotiations and disputes between Equity and TARA are described in the opinion of the District Court in the present case. 478 F. Supp. 496, 498 (SDNY).

[8] The minimum, or "scale," wage varies. In August 1977, for example, the minimum weekly salary was $335 for Broadway performances, and $175 for performances off Broadway. Scale wages are set by a collective-bargaining agreement between Equity and the producers, to which the agents are not parties. When an agent represents an actor or actress whose professional reputation is not sufficient to demand a salary higher than scale, the agent hopes to develop a relationship that will become continually more remunerative as the performer's professional reputation grows, and with it the power to demand an ever higher salary. No agent is required to represent an actor or actress whom he does not wish to represent.

employment, for example—and sometimes more, the regulations deny the agent any commission on the scale portions of the contract. Licensed agents are also precluded from taking commissions on out-of-town expense money paid to their clients. Moreover, commissions are limited on wages within 10% of scale pay,[9] and an agent must allow his client to terminate a representation contract if the agent is not successful in procuring employment within a specified period.[10] Finally, agents are required to pay franchise fees to Equity. The fee is $200 for the initial franchise, $60 a year thereafter for each agent, and $40 for any subagent working in the office of another. These fees are deposited by Equity in its general treasury and are not segregated from other union funds.

In 1977, after a dispute between Equity and Theatrical Artists Representatives Associates (TARA)—a trade association representing theatrical agents, see n. 7, *supra*—a group of agents, including the petitioners, resigned from TARA because of TARA's decision to abide by Equity's regulations. These agents also informed Equity that they would not accept Equity's regulations, or apply for franchises. The petitioners instituted this lawsuit in May 1978, contending that Equity's regulations of theatrical agents violated §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2.

---

[9] It is Equity's view that commissions in the industry are not necessarily related to efforts by the agents, and that an agent often functions as little more than an "order taker," who is able to collect a percentage of a client's wages for the duration of a show for doing little more than answering a producer's telephone call. Indeed, an agent may collect a commission on the salary of an actor or actress he represents even if the client obtains the job without the agent.

[10] Equity argues that this restriction is necessary because there is an incentive for agents to represent as many actors and actresses as possible—and not necessarily to serve them all well—because an agent receives a commission whenever his client is employed at a salary higher than scale, regardless of the extent of his involvement in obtaining employment for the client.

## B

The District Court found, after a bench trial, that Equity's creation and maintenance of the agency franchise system were fully protected by the statutory labor exemptions from the antitrust laws, and accordingly dismissed the petitioners' complaint. 478 F. Supp. 496 (SDNY). Among its factual conclusions, the trial court found that in the theatrical industry, agents play a critical role in securing employment for actors and actresses:

> "As a matter of general industry practice, producers seek actors and actresses for their productions through agents. Testimony in this case convincingly established that an actor without an agent does not have the same access to producers or the same opportunity to be seriously considered for a part as does an actor who has an agent. Even principal interviews, in which producers are required to interview all actors who want to be considered for principal roles, do not eliminate the need for an agent, who may have a greater chance of gaining an audition for his client.

> .     .     .     .     .

> "Testimony confirmed that agents play an integral role in the industry; without an agent, an actor would have significantly lesser chances of gaining employment." *Id.*, at 497, 502.

The court also found "no evidence to suggest the existence of any conspiracy or illegal combination between Actors' Equity and TARA or between Actors' Equity and producers," and concluded that "[t]he Actors Equity franchising system was employed by Actors' Equity for the purpose of protecting the wages and working conditions of its members." *Id.*, at 499.

The Court of Appeals unanimously affirmed the judgment of the District Court. It determined that the threshold issue was, under *United States* v. *Hutcheson,* 312 U. S. 219, 232, whether Equity's franchising system involved any combina-

tion between Equity and any "non-labor groups" or persons who are not "parties to a labor dispute." 622 F. 2d, at 648–649. If it did, the court reasoned, the protection of the statutory labor exemption would not apply.

First, the Court of Appeals held that the District Court had not been clearly erroneous in finding no agreement, explicit or tacit, between Equity and the producers to establish or police the franchising system. *Ibid.* Next, the court turned to the relationship between the union and those agents who had agreed to become franchised, in order to determine whether those agreements would divest Equity's system of agency regulation of the statutory exemption. Relying on *Musicians* v. *Carroll*, 391 U. S. 99, the court concluded that the agents were themselves a "labor group," because of their substantial "economic inter-relationship" with Equity, under which "the union [could] not eliminate wage competition among its members without regulation of the fees of the agents." 622 F. 2d, at 650, 651. Accordingly, since the elimination of wage competition is plainly within the area of a union's legitimate self-interest, the court concluded that the exemption was applicable.[11]

After deciding that the central feature of Equity's franchising system—the union's exaction of an agreement by agents not to charge commissions on certain types of work—was immune from antitrust challenge, the Court of Appeals turned to the petitioners' challenge of the franchise fees exacted from agents. Equity had argued that the fees were necessary to meet its expenses in administering the franchise system, but no evidence was presented at trial to show that the costs justified the fees actually levied. The Court of Appeals suggested that if the exactions exceeded the true

---

[11] The Court of Appeals recognized that even if there had been an agreement between Equity and a "non-labor group," the agreement might still have been protected from the antitrust laws under the "non-statutory" exemption. 622 F. 2d, at 649, n. 1. See *Connell Construction Co.* v. *Pumbers & Steamfitters*, 421 U. S. 616, 622. See n. 19, *infra.*

costs, they could not legally be collected, as such exactions would be unconnected with any of the goals of national labor policy that justify the labor antitrust exemption. Despite the lack of any cost evidence at trial, however, the appellate court reasoned that the fees were sufficiently low that a remand to the District Court on this point "would not serve any useful purpose." *Id.*, at 651.

## II

## A

Labor unions are lawful combinations that serve the collective interests of workers, but they also possess the power to control the character of competition in an industry. Accordingly, there is an inherent tension between national antitrust policy, which seeks to maximize competition, and national labor policy, which encourages cooperation among workers to improve the conditions of employment.[12] In the years immediately following passage of the Sherman Act, courts enjoined strikes as unlawful restraints of trade when a union's conduct or objectives were deemed "socially or economically harmful." *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 485 (Brandeis, J., dissenting).[13] In response to these practices, Congress acted, first in the Clayton Act, 38 Stat. 731, and later in the Norris-LaGuardia Act, 47 Stat. 70, to immunize labor unions and labor disputes from challenge under the Sherman Act.

Section 6 of the Clayton Act, 15 U. S. C. § 17, declares that human labor "is not a commodity or article of commerce," and immunizes from antitrust liability labor organi-

---

[12] See generally Meltzer, Labor Unions, Collective Bargaining, and the Antitrust Laws, 32 U. Chi. L. Rev. 659 (1965); Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L. J. 14 (1963). See also Leslie, Principles of Labor Antitrust, 66 Va. L. Rev. 1183 (1980).

[13] See Winter, *supra* n. 12, at 30–38.

zations and their members "lawfully carrying out" their "legitimate object[ives]." Section 20 of the Act prohibits injunctions against specified employee activities, such as strikes and boycotts, that are undertaken in the employees' self-interest and that occur in the course of disputes "concerning terms or conditions of employment," and states that none of the specified acts can be "held to be [a] violatio[n] of any law of the United States." 29 U. S. C. § 52. This protection is re-emphasized and expanded in the Norris-LaGuardia Act, which prohibits federal-court injunctions against single or organized employees engaged in enumerated activities,[14] and specifically forbids such injunctions notwithstanding the claim of an unlawful combination or conspiracy. While the Norris-LaGuardia Act's bar of federal-court labor injunctions is not explicitly phrased as an exemption from the antitrust laws, it has been interpreted broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes.[15]

In *United States* v. *Hutcheson,* 312 U. S. 219, the Court held that labor unions acting in their self-interest and not in combination with nonlabor groups enjoy a statutory exemption from Sherman Act liability. After describing the

---

[14] As is true under the Clayton Act, the specified activities are protected only in the context of a labor dispute. The Norris-LaGuardia Act defines a labor dispute to include "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U. S. C. § 113 (c).

[15] In *Milk Wagon Drivers* v. *Lake Valley Farm Products, Inc.,* 311 U. S. 91, 103, the Court stated: "For us to hold, in the face of [the Norris-LaGuardia Act], that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the Act and would reverse the declared purpose of Congress."

congressional responses to judicial interference in union activity, *id.*, at 229–230, the Court declared that

> "[s]o long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." *Id.*, at 232 (footnote omitted).

The Court explained that this exemption derives not only from the Clayton Act, but also from the Norris-LaGuardia Act, particularly its definition of a "labor dispute," see n. 14, *supra,* in which Congress "reasserted the original purpose of the Clayton Act by infusing into it the immunized trade union activities as redefined by the later Act." 312 U. S., at 236. Thus under *Hutcheson,* no federal injunction may issue over a "labor dispute," and "§ 20 [of the Clayton Act] removes all such allowable conduct from the taint of being a 'violation of any law of the United States,' including the Sherman [Act]." *Ibid.*[16]

The statutory exemption does not apply when a union combines with a "non-labor group." *Hutcheson, supra,* at 232. Accordingly, antitrust immunity is forfeited when a union combines with one or more employers in an effort to restrain trade. In *Allen Bradley Co.* v. *Electrical Workers,* 325 U. S. 797, for example, the Court held that a union had violated the Sherman Act when it combined with manufacturers and contractors to erect a sheltered local business market in

---

[16] See also *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469. There, in the Term preceding that in which the *Hutcheson* case was decided, the Court reasoned that the Sherman Act prohibits only restraints on "commercial competition," 310 U. S., at 497, 499, 510–511—or those market restraints designed to monopolize supply, control prices, or allocate product distribution—and that unions are not liable where they merely further their own goals in the labor market.

order "to bar all other business men from [the market], and to charge the public prices above a competitive level." *Id.*, at 809.[17] The Court indicated that the union efforts would, standing alone, be exempt from antitrust liability, *ibid.*, but because the union had not acted unilaterally, the exemption was denied.[18] Congress "intended to outlaw business monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the Act." *Id.*, at 811.[19]

---

[17] In *Hunt* v. *Crumboch*, 325 U. S. 821, decided the same day as *Allen Bradley*, the Court ruled that the labor exemption protected a union's boycott of a truck hauler through successful secondary pressure on purchasers of the hauler's services with whom the union had contracts, because of the absence of union participation in a conspiracy with the hauler's competitors. See 325 U. S., at 824; Meltzer, *supra* n. 12, at 677, and n. 74.

[18] *Mine Workers* v. *Pennington*, 381 U. S. 657, also dealt with a union combination with employers, but the grounds of decision were unrelated to the antitrust exemption.

[19] Even where there are union agreements with nonlabor groups that may have the effect of sheltering the nonlabor groups from competition in product markets, the Court has recognized a "nonstatutory" exemption to shield such agreements if they are intimately related to the union's vital concerns of wages, hours, and working conditions. See, *e. g., Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676. This nonstatutory exemption was described as follows in *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S., at 622:

"The Court has recognized . . . that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions. . . .

"The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for

## B

The Court of Appeals properly recognized that the threshold issue was to determine whether or not Equity's franchising of agents involved any combination between Equity and any "non-labor groups," or persons who are not "parties to a labor dispute." 622 F. 2d, at 649 (quoting *Hutcheson,* 312 U. S., at 232).[20] And the court's conclusion that the trial court had not been clearly erroneous in its finding that there was no combination between Equity and the theatrical producers[21] to create or maintain the franchise system is amply supported by the record.

The more difficult problem is whether the combination between Equity and the agents who agreed to become franchised was a combination with a "nonlabor group." The answer to this question is best understood in light of *Musicians* v. *Carroll,* 391 U. S. 99. There, four orchestra leaders, members of the American Federation of Musicians, brought an action based on the Sherman Act challenging the union's unilateral system of regulating "club dates," or one-time musical engagements. These regulations, *inter alia,* enforced a

the lessening of business competition based on differences in wages and working conditions."

Neither the District Court nor the Court of Appeals in this case decided whether the nonstatutory exemption would independently shield the respondents from the petitioners' antitrust claims. See n. 11, *supra.*

[20] Of course, a party seeking refuge in the statutory exemption must be a bona fide labor organization, and not an independent contractor or entrepreneur. See *Meat Drivers* v. *United States,* 371 U. S. 94; *Columbia River Packers Assn.* v. *Hinton,* 315 U. S. 143. See generally 1 P. Areeda & D. Turner, Antitrust Law § 229c, pp. 195–198 (1978). There is no dispute about Equity's status as a bona fide labor organization.

[21] As the employers of Equity's members, producers are plainly a "nonlabor group." Employers almost always will be a "nonlabor group," although an exception has been recognized, for example, when the employer himself is in job competition with his employees. See *Musicians* v. *Carroll,* 391 U. S. 99 (orchestra leaders who both lead an orchestra and play an instrument).

closed shop; required orchestra leaders to engage a minimum number of "sidemen," or instrumentalists; prescribed minimum prices for local engagements; [22] prescribed higher minimum prices for traveling orchestras; and permitted leaders to deal only with booking agents licensed by the union.

Without disturbing the finding of the Court of Appeals that the orchestra leaders were employers and independent contractors, the Court concluded that they were nonetheless a "labor group" and parties to a "labor dispute" within the meaning of the Norris-LaGuardia Act, and thus that their involvement in the union regulatory scheme was not an unlawful combination between "labor" and "nonlabor" groups. The Court agreed with the trial court that the applicable test was whether there was "job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors." *Id.*, at 106.

The Court also upheld the restrictions on booking agents, who were *not* involved in job or wage competition with union members. Accordingly, these restrictions had to meet the "other economic interrelationship" branch of the disjunctive test quoted above. And the test was met because those restrictions were " 'at least as intimately bound up with the subject of wages' . . . as the price floors." *Id.*, at 113 (quoting *Teamsters* v. *Oliver,* 362 U. S. 605, 606). The Court noted that the booking agent restrictions had been adopted, in part, because agents had "charged exorbitant fees, and booked engagements for musicians at wages . . . below union scale." [23]

---

[22] These consisted of a minimum scale for sidemen, a "leader's fee," which was twice the sidemen's scale in orchestras of at least four, and an additional 8% for social security, unemployment insurance, and other expenses. In addition, if a leader did not appear but designated a subleader, and four or more musicians performed, the leader was required to pay from his leader's fee 1.5 times the sidemen's scale to the subleader.

[23] The Court did not explicitly determine whether the second prong

## C

The restrictions challenged by the petitioners in this case are very similar to the agent restrictions upheld in the *Carroll* case.[24] The essential features of the regulatory scheme are identical: members are permitted to deal only with agents who have agreed (1) to honor their fiduciary obligations by avoiding conflicts of interest, (2) not to charge excessive commissions, and (3) not to book members for jobs paying less than the union minimum.[25] And as in *Carroll*, Equity's

---

of the *Hutcheson* test for the statutory exemption had been met, *i. e.,* whether the union had acted in its "self-interest." But given its various findings that the challenged restrictions were designed to cope with job competition and to protect wage scales and working conditions, 391 U. S., at 108, 109, 110, 113, it clearly did so *sub silentio.*

[24] Several cases before *Carroll* also upheld union regulation of the practices of independent entrepreneurs affecting the wages or working conditions of union members. See *Milk Wagon Drivers* v. *Lake Valley Farm Products, Inc.,* 311 U. S. 91; *Teamsters* v. *Oliver,* 358 U. S. 283 (*Oliver I*); *Teamsters* v. *Oliver,* 362 U. S. 605 (*Oliver II*). In *Milk Wagon Drivers,* the Court held that the union had engaged in a "labor dispute" within the meaning of the Norris-LaGuardia Act when it attempted to organize independent "vendors" who supplied milk to retail stores. There the union feared that the "vendor system" was designed to escape the payment of union wages and the assumption of union-imposed working conditions. In *Oliver I,* the *Milk Wagon Drivers* decision was invoked to protect from state antitrust challenge a union's successful efforts to prescribe through collective-bargaining agreements a wage scale for truckdrivers, and minimum rental fees for drivers who owned their own trucks. The union feared that driver-owners, whose fees included not only an entrepreneurial component but also a "wage" for the labor of driving, might undercut the union scale by charging a fee that effectively included a subscale wage component. The Court stated that "[t]he regulations embod[ied] . . . a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract." 358 U. S., at 294. See also *Oliver II, supra,* at 606 (after remand to the state court).

[25] Indeed, the District Court in *Carroll,* whose judgment was affirmed by this Court "in its entirety," 391 U. S., at 114, drew parallels with the restrictions at issue in the present case. The court noted that "[a]p-

regulation of agents developed in response to abuses by employment agents who occupy a critical role in the relevant labor market.[26] The agent stands directly between union members and jobs, and is in a powerful position to evade the union's negotiated wage structure.

The peculiar structure of the legitimate theater industry, where work is intermittent, where it is customary if not essential for union members to secure employment through agents, and where agents' fees are calculated as a percentage of a member's wage, makes it impossible for the union to defend even the integrity of the minimum wages it has negotiated without regulation of agency fees.[27] The regulations are "brought within the labor exemption [because they are] necessary to assure that scale wages will be paid . . . ." *Carroll*, 391 U. S., at 112. They "embody . . . a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure." *Teamsters* v. *Oliver*, 358 U. S.

---

parently, similar abuses by booking agents existed in other fields too. *Edelstein* v. *Gillmore*, 35 F. 2d 723, 726 (2d Cir. 1929) (actors)." *Carroll* v. *AFM*, 241 F. Supp. 865, 892 (SDNY).

The petitioners argue that theatrical agents are indistinguishable from "numerous [other] groups of persons who merely supply products and services to union members" such as landlords, grocers, accountants, and lawyers. But it is clear that agents differ from these groups in two critical respects: the agents control access to jobs and negotiation of the terms of employment. For the actor or actress, therefore, agent commissions are not merely a discretionary expenditure of disposable income, but a virtually inevitable concomitant of obtaining employment.

[26] See *Carroll* v. *AFM*, 241 F. Supp., at 881–882; Harding, *supra* n. 6, at 319–325.

[27] The Court of Appeals found that "the union *cannot* eliminate wage competition among its members without regulation of the fees of the agents." 622 F. 2d, at 651 (emphasis added). Wage competition is prevented not only by the rule precluding commissions on scale jobs. Actors and actresses could also compete over the percentage of their wages they were willing to cede to an agent, subject only to the restrictions imposed by state law.

283, 294. Agents must, therefore, be considered a "labor group," and their controversy with Equity is plainly a "labor dispute" as defined in the Norris-LaGuardia Act: "representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U. S. C. § 113 (c).

Agents perform a function—the representation of union members in the sale of their labor—that in most nonentertainment industries is performed exclusively by unions. In effect, Equity's franchise system operates as a substitute for maintaining a hiring hall as the representative of its members seeking employment.[28]

Finally, Equity's regulations are clearly designed to promote the union's legitimate self-interest. *Hutcheson,* 312 U. S., at 232. In a case such as this, where there is no direct wage or job competition between the union and the group it regulates, the *Carroll* formulation to determine the

---

[28] In many industries, unions maintain hiring halls and other job referral systems, particularly where work is typically temporary and performed on separate project sites rather than fixed locations. By maintaining halls, unions attempt to eliminate abuses such as kickbacks, and to insure fairness and regularity in the system of access to employment. In a 1947 Senate Report, Senator Taft explained: "The employer should be able to make a contract with the union as an employment agency. The union frequently is the best employment agency. The employer should be able to give notice of vacancies, and in the normal course of events to accept men sent to him by the hiring hall." S. Rep. No. 1827, 81st Cong., 2d Sess., 13 (1947), quoted in *Teamsters* v. *NLRB,* 365 U. S. 667, 673–674.

The National Labor Relations Board and the courts have ruled that union demands for hiring halls are a mandatory subject of collective bargaining, and that strikes to obtain such provisions are protected activity. See, *e. g., Houston Chapter, Associated General Contractors,* 143 N. L. R. B. 409, enf'd, 349 F. 2d 449 (CA5); *NLRB* v. *Tom Joyce Floors, Inc.,* 353 F. 2d 768, 771 (CA9). Cf. *Teamsters* v. *NLRB, supra,* at 672–673, 676.

presence of a nonlabor group—whether there is " 'some . . . economic interrelationship affecting legitimate union interests . . . ,' " 391 U. S., at 106 (quoting District Court opinion)—necessarily resolves this issue.

## D

The question remains whether the fees that Equity levies upon the agents who apply for franchises are a permissible component of the exempt regulatory system. We have concluded that Equity's justification for these fees is inadequate. Conceding that *Carroll* did not sanction union extraction of franchise fees from agents,[29] Equity suggests, only in the most general terms, that the fees are somehow related to the basic purposes of its regulations: elimination of wage competition, upholding of the union· wage scale, and promotion of fair access to jobs. But even assuming that the fees no more than cover the costs of administering the regulatory system, this is simply another way of saying that without the fees, the union's regulatory efforts would not be subsidized—and that the dues of Equity's members would perhaps have to be increased to offset the loss of a general revenue source.[30] If Equity did not impose these franchise fees upon the agents, there is no reason to believe that any of its legitimate interests would be affected.[31]

---

[29] See *Carroll,* 241 F. Supp., at 881. We have, in fact, found no case holding that a union may extract such fees from independent agents who represent union members.

[30] As already indicated, the franchise fees are not segregated in any manner but merely deposited in the union's general fund.

[31] The respondents offer union hiring hall fees as an analogy in support of Equity's collection of franchise fees. In that context, the respondents argue, without citation, that a union may impose reasonable fees upon employers to meet the costs of maintaining a union-run hiring hall. But even if the respondents' statement of labor law is correct, the analogy would not be persuasive. Assuming that hiring hall fees are so imposed, the fees are borne by parties who directly benefit from the employment

## III

For the reasons stated, the judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and JUSTICE MARSHALL join, concurring in part and dissenting in part.

I join all but Part II–D of the Court's. opinion. That part holds that respondents' exaction of a franchise fee is not a "permissible component of the exempt regulatory system." *Ante,* at 722. Rather, I agree with the Court of Appeals that the approximately $12,000 collected annually in fees is not "incommensurate with Equity's expenses in maintaining a full-time employee to administer the system," 622 F. 2d 647, 651 (CA2 1980), and thus is not "unconnected with any of the goals of national labor policy which justify the antitrust exemption for labor," *ibid.*

The Court justifies its conclusion by suggesting that, since the union could increase its dues to offset the revenue lost from invalidation of the fee system, "there is no reason to believe that any of [the union's] legitimate interests would be affected," if the fee system were found to violate the antitrust laws. *Ante,* at 722. The union could of course raise its dues, but the issue here is whether the conceded antitrust immunity of the franchising system includes the franchise fee.

I find somewhat incongruous the Court's conclusion that an incident of the overall system constitutes impermissible regulation, but that agents in general may be significantly

services of the hiring halls and are collected by the entities that provide them. That is not true in the present case.

The view expressed in the separate opinion filed today as to who are the beneficiaries of the franchising system will undoubtedly surprise the agents who brought this lawsuit. *Post,* at 724.

regulated because they are not a "nonlabor group." This incongruity is highlighted by the similarity between union hiring halls and the franchising system, a similarity which the Court itself acknowledges: "Equity's franchise system operates as a substitute for maintaining a hiring hall as the representative of its members seeking employment." *Ante,* at 721. The Court disregards this similarity in concluding that the franchising system does not "directly benefit" the agents who are required to pay the fees. *Ante,* at 722, n. 31. It reaches this conclusion by incorrectly assuming that the only parties who directly benefit from the hiring hall and the franchising system are employers and employees and producers and actors, as the case may be. But surely the agents also benefit from the franchising system, which provides an orderly and protective mechanism for pairing actors who seek jobs with producers who seek actors. The system is thus the means by which the agents ultimately receive their commissions; it is as much the source of their livelihood as it is that of the actors.

Because the fee is an incident of a legitimate scheme of regulation and because it is commensurate in amount with the purpose for which it is sought, I would also affirm this holding of the Court of Appeals.