**ALTEMOSE CONSTRUCTION COMPANY, Associated Builders and Contractors, Inc., the Chamber of Commerce of the United States of America**

v.

**BUILDING & CONSTRUCTION TRADES COUNCIL OF PHILADELPHIA AND VICINITY, et al.**

**Appeal of ALTEMOSE CONSTRUCTION COMPANY.**

**Appeal of the CHAMBER OF COMMERCE OF the UNITED STATES of. America.**

Nos. 83–1581, 83–1582.

United States Court of Appeals, Third Circuit.

Argued Sept. 11, 1984.

Decided Jan. 8, 1985.

Rehearing and Rehearing In Banc Denied Feb. 15, 1985.

John W. Pelino (argued), David A. Gradwohl, Howard A. Rosenthal, Pelino & Lentz, P.C., Philadelphia, Pa., for Altemose Construction Co.

Gerard C. Smetana (argued), Gary L. Starkman, Arvey, Hodes, Costello & Burman, Chicago, Ill., for The United States Chamber of Commerce.

Richard B. Sigmond (argued), Bernard N. Katz, Margaret A. Browning, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for Building and Construction Trades Council of Philadelphia and Vicinity, et al.

Laurence J. Cohen, Robert D. Kurnick, Sherman, Dunn, Cohen, Leifer & Counts, P.C., Washington, D.C., for Building and Construction Trades Department, AFL–CIO, amicus curiae.

Before GIBBONS and GARTH, Circuit Judges, and TEITELBAUM, District Judge *.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Altemose Construction Company (Altemose), a general contractor, Associated Builders and Construction Contractors, Inc. (ABC), an association of open shop contractors, and the Chamber of Commerce of the United States of America, an association whose members purchase construction and are construction users, brought this action for declaratory relief pursuant to 28 U.S.C. § 2201–02 (1982), treble damages pursuant to 15 U.S.C. § 15 (1982), and injunctive relief pursuant to 15 U.S.C. § 26 (1982). Altemose and The Chamber of Commerce appeal from a summary judgment in favor of defendants. The defendants are the Building and Construction Trades Council of Philadelphia (the Council), an association of local building trade unions in the Philadelphia area, and fifty-six local unions who are members of the Council. The complaint charges that the defendants conspired among themselves and with other named co-conspirators to eliminate competition in the commercial construction industry in the Philadelphia area by excluding open shop contractors from that industry and by forcing all contractors to employ only union subcontractors, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982). The district court held that there were no material issues of disputed fact and that the defendants were entitled to a judgment in their favor as a matter of law.[1] We reverse and remand for further proceedings.

### I.

### Count I

The complaint pleads two counts. Count I alleges that the local union defendants and the Council conspired with non-labor entities to exclude non-union general and subcontractors from the Philadelphia area construction market. The trial court dismissed Count I because the plaintiffs failed to present any evidence of a combination or conspiracy with non-union entities in opposition to defendants' motion for summary judgment. Our review of this ruling is plenary.

### A.

### The Count I Defendants and Alleged Co-Conspirators

The Council is an association of building trades local unions in the Philadelphia area which are in good standing with international unions affiliated with the Building and Construction Trades Department, AFL–CIO. Among other tasks, the Council

---

* Hon. Hubert I. Teitelbaum, Chief Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. Counterclaims are pending in the district court. The court ordered that the summary judgment on plaintiffs' claims be entered as a final judgment pursuant to Fed.R.Civ.P. 54(b). Thus we have appellate jurisdiction.

resolves jurisdictional disputes among these local unions. Local unions which are members of the Council may not inaugurate strikes or place pickets against a general contractor "fair to union labor" without the Council's consent. A general contractor "fair to union labor" is defined in the Council's by-laws as one that employs union labor and subcontracts work only to subcontractors employing union labor. The by-laws also provide that "any contractor who works on a struck job or employs non-union men to work on a struck job, shall be declared unfair and all Union men shall be called off from his work or shop," and that "[n]o local ... shall enter into any agreement with a Contractors' or Employers' Association to work with non-union men." The by-laws provide further:

> To the extent it is legally permitted and in conformity with both the law and existing contract obligations, any trade affiliated with the Building Trades may picket any job that has a non-union condition, if the General Contractor has a Building Trades Agreement or is a member of G.B.C.A. and maintain the picket line with full support and sanction of the Building Trades until the situation is corrected.

The reference in the quoted by-law provision to G.B.C.A. is to the General Building Contractors Association, an association of general contractor and subcontractor members who engage in collective bargaining with building trades unions through that organization. The reference to a Building Trades Agreement is to standard agreements which the Council has obtained from over 400 contractors and subcontractors in the Philadelphia area. The Council publishes a Union Directory of Fair Contractors and Subcontractors. The fair contractors and subcontractors all have collective bargaining agreements with local unions which are members of the Council. The collective bargaining agreements give union members the right not to work with non-union laborers and oblige the contractors and subcontractors to hire only union employees and to refrain from subcontracting with subcontractors who are not on the Council's fair contractor list. Since 1966, over 90% of the construction work in the Philadelphia area has been performed by firms listed in the Council's Union Directory of Fair Contractors and Subcontractors.

It is undisputed that the Council is a labor organization, and that in obtaining Building Trades Agreements it is, at least in part, pursuing the labor objective of maintaining area standards for wages and working conditions. The plaintiffs' theory in Count I of the complaint, however, is that the Council and its members have acted in concert with contractors and subcontractors on its fair contractor list to exclude from the construction market in the Philadelphia area all firms which are not on that list.

### B.

### Standards for Proof of Conspiracy

This court recently outlined the legal standard governing sufficiency of evidence of conspiracy. We noted that the court must examine all admissible evidence, direct and circumstantial, in order to determine whether a trier of fact could reasonably infer concert of action. *In re Japanese Electronic Products*, 723 F.2d 238, 303–05 (3d Cir.1983). For purposes of this appeal that standard will be applied in determining whether or not summary judgment was proper on Count I. Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, (1982), does not require the application of any different standard. That section requires "clear proof" that an actor is an agent of a union, but the clear proof requirement is inapplicable to proof of conspiracy or other wrongful acts in antitrust actions against labor unions. *Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). Moreover, even with respect to proof of agency, the "clear proof" standard should be applied by the factfinder in drawing inferences and making findings. On a Rule 56 motion we may not draw inferences or make findings. Thus even on issues of union authorization, participation in, or ratification of acts com-

plained of, our role is to determine only whether such inferences are, under the evidence, logically permissible. Our plenary review of the grant of summary judgment is no different when the defendants are labor unions than in any other summary judgment context. If logical inferences of union authorization, participation in, or ratification of the acts complained of are permissible, it will be for the trier of the facts to apply the "clear proof" standard of section 6.

### C.

### The Summary Judgment Record

There is evidence in the summary judgment record from which a factfinder could conclude that the Council and its member locals resorted to rather vigorous efforts to obtain Building Trades Agreements. The defendants have picketed jobsites where non-union tradespersons were working. They have resorted to threats of violence and actual violence at various jobsites. They have employed economic pressure not only upon contractors, but upon developers, owners, and financial institutions, to force contractors to employ union labor and union subcontractors exclusively.

Altemose, a general contractor, has refused to sign a Building Trades Agreement. It employs a permanent labor force which is not covered by collective bargaining agreements with Council members, and it follows a policy of awarding subcontracts to the lowest bidder, whether or not the subcontractor employs union labor. In April, 1971, Altemose obtained a general contract to build Valley Forge Plaza in Montgomery County, Pennsylvania, a project consisting of an office building, a hotel, theaters, stores and shops. The Council insisted that unless Altemose signed a Building Trades Agreement there would be picketing on the jobsite. On June 5, 1972, approximately 1000 persons, including some principals of the Council, committed what was described by a Pennsylvania trial judge as a "virtual military assault" on the Valley Forge jobsite, inflicting physical damage estimated at $300,000. *See Altemose Construction Co. v. Building and Construction Trades Council,* 449 Pa. 194, 198, 296 A.2d 504, 507 (1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973). Thereafter the Council repeated its demand that Altemose execute a Building Trades Agreement. Picketing occurred at other Altemose jobsites as well.

After Altemose filed an unfair labor practice charge, the National Labor Relations Board was successful in obtaining an injunction, pursuant to section 10(1) of the National Labor Relations Act, 29 U.S.C. § 160(1) (1982) restraining the Council from engaging in secondary boycotts pending Board resolution of the charge.[2] While the dispute between Altemose and the Council members continued, the Council threatened non-union subcontractors and intimidated them into ceasing to do business with Altemose. It also pressured material suppliers, who advised Altemose they would no longer furnish material for its construction projects. Union members and the public were urged to withdraw deposits from First Pennsylvania Bank, a major financier of the Valley Forge Project. Businesses were urged to cancel, and did cancel, reservations at the Sheraton Hotel, a tenant in the Valley Forge complex. Altemose found it difficult to obtain performance bonds for its projects because of the labor unrest caused by the Council, and in some instances found its bid rejected although it was the low bidder.

Although the record evidence with respect to other ABC contractors is less dramatic than with respect to Altemose, there is evidence that the Council engaged in similar activities directed at them. Union-sponsored picketing forced general contractors to replace non-union subcontractors with subcontractors listed in the Union Directory of Fair Contractors and Subcontractors. Union pressure was directed toward their material suppliers, and toward

---

**2.** *Hirsch v. Building and Constr. Trades Council,* 530 F.2d 298 (3d Cir.1976). The Board's resolution of the charge is discussed at Part II A 2, *infra.*

financial institutions which might furnish funding for their projects.

Thus the summary judgment record clearly would support a finding that the Council and its members exerted both primary and secondary pressure in order to prevent non-union firms from obtaining construction work in the Philadelphia area. The defendants contend, however, that such pressure, whether or not legal as a matter of labor law, is exempt from antitrust scrutiny because of the statutory and nonstatutory labor antitrust exemptions. The plaintiffs, relying on *Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), and *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), contend that the defendants forfeited both exemptions by acting in concert with the contractors listed in the Union Directory of Fair Contractors and Subcontractors. Defendants counter that there is no evidence, direct or circumstantial, in the summary judgment record which would permit an inference of concert of action between the labor defendants and the favored contractors.

There is evidence of a predominantly unionized construction market in the Philadelphia area. The Council has obtained over 850 Building Trades Agreements with general contractors; its member locals have collective bargaining agreements with more than 4,000 subcontractors, and as a result approximately 90% of the construction market is served by contractors listed in the Union Directory of Fair Contractors and Subcontractors.[3] Standing alone, that evidence probably would not permit an inference of concern of action among the defendants and the favored contractors aimed at excluding non-union firms from the market. One result of the Council's pressure tactics was to favor contractors on its list of fair contractors. Another result, however, was to obtain the work for members of its local unions. Absent some additional evidence, the inference that the Council acted in concert with the contractors in pursuit of the first objective would be highly speculative.

The summary judgment record contains, however, some such additional evidence. There is evidence that the General Building Contractors Association, a contractor organization, polices its members to be sure that they deal only with subcontractors on the Council's fair contractors list. That conduct appears to be conscious parallel conduct which *prima facie* is inconsistent with contractor economic interest in awarding work to the lowest bidder. There is evidence that in at least one instance an officer of the Council complained to the General Building Contractors Association that one of its members had hired a non-union subcontractor, that the matter was discussed with the member, and the offense was rectified. (Deposition of Joseph M. Washkill). Moreover, Altemose produced evidence from which it could be found that the Council promised that if Altemose signed a Building Trades Agreement the Council would send it unionized companies that would finish its jobs at prices lower than that bid by ABC subcontractors.

The General Building Construction Association is comprised of non-labor members. Unlike the theatrical agents in *H.A. Artists & Associates, Inc. v. Actors Equity Ass'n.,* 451 U.S. 704, 101 S.Ct. 2102, 68 L.Ed.2d 558 (1981), the Association's efforts are aligned on the side of purchasers rather than sellers of labor. If it acted in concert with the Council, this case would be governed by *Allen Bradley Co., supra,* for purposes of the statutory exemptions in sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52 (1982), and sections 4, 5 and 13 of the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105 and 113 (1982). Further, *Connell Construction Co. v. Plumbers & Steamfitters Local 100, supra,* would in such cir-

**3.** Most of the ten percent balance could be found to be small residential construction, which has not been organized.

cumstances rule out the application of the nonstatutory exemption of the Sherman Act to an agreement between the General Building Contractors Association and the Council restraining competition of the non-union contractors who are members of ABC.

■ We hold that the trial court erred in granting summary judgment on Count I for lack of evidence from which concert of action between labor and non-labor entities could be inferred. The record contains circumstantial evidence that the unions maintained a fair contractor list; that the Council exerted primary and secondary pressure which had the inevitable effect of benefiting contractors on the list; that firms not on the list were almost totally excluded from the market; that the General Building Contractors Association policed its members to prevent use of non-union contractors, although the contractors' economic interest would suggest, *prima facie*, use of the lowest responsible bidders without regard to unionization; and that an officer of the Council offered to obtain bids from firms on the fair contractors list if Altemose would sign a Building Trades Agreement. A finder of fact evaluating this evidence could reasonably infer that the Council and the General Building Contractors Association acted in concert to exclude non-union firms from the market. The evidence of such concert of action is not overwhelming, but it is not our task on a motion for summary judgment to weigh it, so long as it is sufficient to support a reasonable inference.

## II.

## Count II

The second count of the complaint alleges that the local unions and the Council conspired to force non-union employers out of the Philadelphia construction market. This count does not allege participation by non-union entities in a conspiracy having secondary effects. The trial court dismissed Count II holding that even if such a conspiracy were proved, both the statutory and the non-statutory exemptions preclude an antitrust cause of action. As with the summary judgment on Count I, our review is plenary.

## A.

### The Exemptions

The concerted coercive activities in which the Council and its member locals may be found to have engaged would clearly result in antitrust liability if engaged in by non-labor parties. The defendants contend that because they are labor organizations, while they may be accountable under federal labor law or state tort law, they are exempt from antitrust liability. Courts and commentators commonly refer to two separate sources of exemption: statutory and nonstatutory.

### (1) The Statutory Exemption

The statutory sources of antitrust exemption for labor organizations are sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17 (1982), and 29 U.S.C. § 52 (1982), and sections 4, 5 and 13 of the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105 and 113 (1982). These statutes declare that labor unions are not in themselves combinations or conspiracies in restraint of trade, and exempt many of their activities from the operation of the antitrust laws. Interpreting these interrelated statutes, the Supreme Court in *United States v. Hutcheson*, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941), held that unilateral union activity having a labor objective is exempt "[s]o long as a union acts in its self-interest and does not combine with non-labor groups," even though the underlying dispute is a jurisdictional one with another union, and does not concern mandatory subjects of collective bargaining. In *United Mine Workers v. Pennington*, 381 U.S. 657, 662, 85 S.Ct. 1585, 1589, 14 L.Ed.2d 626 (1965), and *Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), however, the Court interpreted the exemption statutes as inapplicable to concerted action or agreements between unions and non-labor parties having effects outside the parties' collective bar-

gaining relationship. That interpretation of the statutory exemption was reiterated in *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). *See Larry v. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 609 F.2d 1368, 1373 (3d Cir.1979); *Consolidated Express Inc. v. N.Y. Shipping Ass'n*, 602 F.2d 494, 517 (3d Cir.1979), *vacated and remanded on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980).

The Building Trades Agreements which the Council sought to impose on Altemose and other ABC members were essentially the same as the agreement considered by the Supreme Court in *Connell*, in that when executed they obliged the signatories to refrain from subcontracting to non-union subcontractors. In *Connell*, the Supreme Court held that the challenged agreement was subject to antitrust sanctions. The trial court held, nevertheless, that the statutory exemption applied in this case, because in *Connell* the plaintiff had executed the agreement, whereas the plaintiffs here refused to do so. The court's reasoning misinterprets both the complaint and the Supreme Court's caselaw.

■ Count II alleges, and the summary judgment record would permit a finding, that the open shop contractors have been injured in their business and property by the exclusion of subcontractors from the construction market in the Philadelphia area, and by the inability of general contractors to obtain bids from union subcontractors. The record is clear that the Council has obtained Building Trades Agreements from hundreds of signatories. It is true that in *Connell* the Court made reference to the fact that the plaintiff had signed a contract, implying that this satisfied the *Bradley-Pennington* requirement of participation in the combination of a non-labor party. 421 U.S. at 620, 622, 95 S.Ct. at 1834, 1835. The opinion cannot be read as suggesting, however, that contractors who do not sign a contract but are affected by agreements between a union and non-labor parties are unprotected by the antitrust laws. Clearly the Council did not act unilaterally when it obtained hundreds of agreements from contractors the intent and effect of which was to exclude non-union contractors from the market. Thus we cannot affirm the summary judgment on Count II on the theory that the Clayton Act and the Norris-LaGuardia Act exempt the conduct complained of.

### (2) The Nonstatutory Exemption

The nonstatutory exemption involves the interrelationship between judge-made interpretations of the Sherman Act and several subsequent congressional labor law enactments. The seminal nonstatutory exemption case is *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), in which the Court held that the Sherman Act did not apply to a conspiracy by labor union members to obstruct or prevent delivery in interstate commerce of goods manufactured by a party with which they had a labor dispute. Conceding that neither the Clayton Act nor the Norris-LaGuardia Act afforded exemption, the Court held that Congress nevertheless did not intend the Sherman Act to reach the conduct in question. We have noted that

> *Apex Hosiery* establishes two principles central to the subsequent development of the nonstatutory exemption. First, the rationale of the exemption is protection of the union's power to eliminate competition in the labor market over wages and working conditions. Restraints operating on that primary market are presumptively outside the scope of the Sherman Act. Second, restraints, like those in *Duplex Printing [Press] Co. [v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921)] ..., which are aimed at controlling a secondary product or service market are suspect, and are presumptively covered by the Sherman Act.

*Consolidated Express, Inc.*, 602 F.2d at 514.

Critical to the application of the nonstatutory exemption, therefore, is the identification and lawfulness of the labor parties' objectives. The lawfulness of those objectives, moreover, depends upon several statutes enacted subsequent to the *Apex Hosiery* interpretation of the Sherman Act.

The first such enactment was the Labor Management Relations Act of 1947. Pub.L. No. 101, ch. 120, 61 Stat. 136, *codified as amended* at 29 U.S.C. §§ 141–97 (1982). Section 8(b)(4) of that statute for the first time made it an unfair labor practice for a union to coerce "the employees of any employer" with the object of "forcing or requiring any employer ... to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer ...." This prohibition against activity aimed at secondary targets did not, however, reach restraints embodied in collective bargaining arrangements. Thus under the Labor Management Relations Act unions, as a matter of labor law, remained free to seek such restraints by collective bargaining and picketing.

The Labor-Management Reporting and Disclosure Act of 1959 imposed further restraints upon union activity directed at secondary targets. That act amended section 8(b)(4) to extend the prohibitions against coercion directed toward secondary targets to coercion of employers as well as to coercion of employees. Pub.L. No. 86, ch. 257, § 704(a), 73 Stat. 542, *codified at*, 29 U.S.C. § 158(b)(4)(i) (1982). In addition a new section 8(e) was added to the National Labor Relations Act, making it an unfair labor practice for any labor organization to enter into a contract or agreement whereby an employer "agrees to ... cease doing business with any other person ...." *Id.* § 704(b). The section 8(e) prohibition against contract provisions thus was added to the section 8(b)(4) prohibition against coercion. The section 8(e) prohibition against contract clauses in which employers agreed to refrain from doing business with other persons was qualified, however, by the proviso that

> nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction....

*Id.* In addition, despite the general prohibitions of sections 8(b)(4) and 8(e), applicable to labor organizations, and the prohibitions in section 8(a) against employer assistance in organizing, the Labor-Management Reporting and Disclosure Act of 1959 provided that:

> [i]t shall not be an unfair labor practice under subsections (a) and (b) ... for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members ... because (1) the majority status of such labor organization has not been established ..., or (2) such agreement requires as a condition of employment, membership in such labor organization....

Pub.L. No. 86–257 § 705(a), 73 Stat. 545, *codified at* 29 U.S.C. § 158(f) (1982). This section thus authorizes pre-hire agreements on representation in the construction industry.

After the enactment of the Labor Management Relations Act of 1947 and the Labor-Management Reporting Act of 1959, it was for some time unclear whether the Supreme Court would consider those statutes as preemptive of the Sherman Act insofar as it might apply to secondary activities by labor organizations. In *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 633–34, 95 S.Ct. 1830, 1840–41, 44 L.Ed.2d 418 (1975), the Court held that section 8(e) was not preemptive of the Sherman Act, leaving open the preemption question with respect to section 8(b). *Id.* *Connell* is a construc-

tion industry case, and the Court held that the authorization in section 8(f) of pre-hire agreements in the construction industry did not apply "outside the context of a collective-bargaining relationship." [4] *Id.* at 635, 95 S.Ct. at 1841. Thus it is clear that contractual provisions prohibiting contracts with nonunion firms, entered into outside the collective bargaining context, and coercive concerted activities aimed at obtaining such agreements, remain subject to antitrust scrutiny under the Sherman Act.

The district court held that despite *Connell* the Building Trades Agreements challenged here, and the coercive activities exerted in an effort to obtain such agreements, were exempt from Sherman Act scrutiny on two grounds.

First, the court reasoned, there is in the record no agreement prohibiting the use of non-union contractors, whereas in *Connell* the plaintiff executed, but later disavowed such an agreement. We have already rejected that reasoning with respect to the statutory exemptions. Part II A(1), *supra.* It is no more persuasive with respect to the nonstatutory exemption. Altemose and other ABC contractors, not in a collective bargaining relationship with the defendants, were subject to coercion aimed at obtaining the prohibited contracts. Moreover, there is ample evidence that other signatories refrained from doing business with those plaintiffs as a result of such agreements.

Alternatively the court held that in this case, unlike *Connell,* the unions could not be found to have violated the federal labor law. The court reasoned that if the union activity was legal as a matter of labor law it must be exempt under the antitrust laws.[5] The court found that the coercion

against Altemose was justified because even though the union had no collective bargaining relationship with Altemose, the coercion had an organizational purpose at all times. On this record, however, the existence of a purpose to organize employees of Altemose and other ABC contractors is a disputed issue of material fact which could not be resolved in the defendants' favor on a Rule 56 motion. There is evidence in the record from which a factfinder could infer that the Council had no such purpose. Moreover the Council itself does not enter into collective bargaining agreements. At best it sought from Altemose and the ABC contractors an agreement to enter into pre-hire agreements if they should later enter into collective bargaining agreements.

Recognizing that disputed fact issues as to the Council's purpose would ordinarily preclude summary judgment, the trial court held that the plaintiffs were collaterally estopped from contending for the absence of an organizational purpose by virtue of the decision of the National Labor Relations Board in Altemose's unfair labor practice case. In that proceeding the Board found that the respondent unions had violated section 8(b)(7) of the Act, 29 U.S.C. § 158(b)(7) (1982), by engaging in organizational picketing for more than thirty days. We are not persuaded that collateral estoppel justified a summary judgment. We have held that a Board decision may be given preclusive effect in a subsequent antitrust case. *Consolidated Express,* 602 F.2d at 503. In that case, however, the party against which collateral estoppel was asserted was a respondent, which controlled its side of the litigation before the Board. Altemose, as the charging party, had no control over the factual

---

**4.** Recently in *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982), the Court in an unfair labor practice case construed the proviso to be applicable to subcontractor clauses in collective bargaining agreements whether or not restricted to jobsites at which both union and nonunion workers are employed.

**5.** *But see United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council (Muko I),* 609 F.2d 1368, 1375, n. 1.

or legal issues tried before the Board because the General Counsel controlled the litigation. 29 U.S.C. § 160 (1982). Moreover, ABC and the Chamber of Commerce were not involved in the Board proceeding even as charging parties. Thus it is clear that no plaintiff had a full and fair opportunity to litigate the issue of organizational purpose before the Board, and all are free to attempt to do so in this proceeding.[6]

■ Thus there are material issues of disputed fact over whether the Council and those acting in concert with it had an organizational purpose. *A fortiori* there are material fact issues as to the existence of a collective bargaining relationship. Absent such a relationship the pre-hire exception for the construction industry is inapplicable. If it is inapplicable, *Connell* precludes application of a nonstatutory exemption to the antitrust laws.

### III.

### Conclusion

Since there are material issues of disputed fact which preclude application of the statutory and nonstatutory exemptions either to Count I or to Count II, the court erred in entering summary judgment for the defendants. The judgment appealed from will, therefore, be reversed and the case remanded for trial.

---

**6.** This case is fundamentally different, therefore, from *Donald Schriver, Inc. v. NLRB,* 635 F.2d 859 (D.C.Cir.1980), on which the trial court relied, which was before the court on the Board's petition for enforcement.