Thomas M. COLLINS, Plaintiff,

v.

NATIONAL BASKETBALL PLAYERS ASSOCIATION and Charles Grantham, Defendants.

Civ. A. No. 91–M–706.

United States District Court, D. Colorado.

Dec. 31, 1991.

---

Alan H. Bucholtz, Bucholtz, Bull & Ewing, Denver, CO and J. Shelby Sharpe, Sharpe Bates McGee & Spurlock, Ft. Worth, TX, for plaintiff.

James E. Scarboro, Mary Gabrielle Sprague, Arnold & Porter, Denver, CO, and George H. Cohen, Robert M. Weinberg and Patricia Polach, Bredhoff & Kaiser, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

Defendants, National Basketball Players Association (NBPA), the exclusive bargaining representative for all of the players in the National Basketball Association (NBA), and Charles Grantham (Grantham), Co-Chairman of the Committee on Agent Registration and Regulation of the NBPA (collectively NBPA, Defendants), moved for summary

judgment on all claims of Plaintiff Thomas P. Collins (Collins, Plaintiff). Collins challenges the legality of the NBPA Regulations Governing Player Agents (Regulations) and the operation of Article XXXI of the NBPA's collective bargaining agreement with the NBA (NBPA–NBA Agreement) which forbids NBA teams from negotiating with agents who are not certified by the NBPA. Collins alleges that these restrictions are a "group boycott" and per se violation of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 & 2. Collins also claims that defendants tortiously interfered with his contracts and intentionally interfered with his prospective business advantage.

The NBPA is a labor organization within the meaning of § 2 of the National Labor Relations Act (NLRA), 29 U.S.C. § 152. For more than thirty years the NBA has recognized the NBPA as the exclusive bargaining representative for all professional basketball players employed by each of the NBA member teams, pursuant to § 9 of the NLRA, 29 U.S.C. § 159. As the exclusive bargaining representative for all of the professional basketball players employed by the twenty-seven NBA member teams, the NBPA has the exclusive authority to negotiate individualized salaries and conditions of employment on behalf of each player. The NBA and the NBPA have entered into collective bargaining agreements for the past twenty years. Grantham Decl. ¶ 3. Like other unions, the NBPA negotiates minimum salaries, pension benefits, health insurance, and a grievance-arbitration procedure. The NBPA also negotiates issues unique to professional sports including a minimum individual player salary and a maximum amount any member team can pay to the aggregate of its players, the college draft, the ability of players to move from team to team, players' playoff compensation, travel accommodations, playing conditions, medical treatment and licensing rights. Id. ¶ 4.

Like other sports and entertainment unions, the NBPA believes that the collective good of the entire represented group is maximized when individualized salary negotiations occur within a framework that permits players to exert leverage based on the their unique skills and personal contributions. Id. ¶ 5. The NBPA therefore has authorized the players or their individually selected agents to negotiate individual compensation packages. Id. This delegation of representational authority to individual players and their agents has always been limited solely to the authority to negotiate individual compensation packages, and to enforce them through the grievance-arbitration procedure established by the NBPA–NBA Agreement. Id. ¶ 6; NBPA–NBA Agreement at 2, 139–154.

Player agents were unregulated by the NBPA before 1986. By the mid–1980s, a substantial number of players had complained to the officers of the NBPA about agent abuses. Id. ¶ 7. Specifically, players complained that the agents imposed high and non-uniform fees for negotiation services, insisted on the execution of open-ended powers of attorney giving the agents broad powers over players' professional and financial decisions, failed to keep players apprised of the status of negotiations with NBA teams, failed to submit itemized bills for fees and services, and, in some cases, had conflicts of interest arising out of representing coaches and/or general managers of NBA teams as well as players. Id. Many players believed they were bound by contract not to dismiss their agents regardless of dissatisfaction with their services and fees, because the agents had insisted on the execution of long-term agreements. Id. Some agents offered money and other inducements to players, their families and coaches to obtain player clients. Id.

In response to these abuses, the NBPA established the Regulations, a comprehensive system of agent certification and regulation, to insure that players would receive agent services that meet minimum standards of quality at uniform rates. First, the Regulations provide that a player agent may not conduct individual contract negotiations unless he signs the "Standard Player Agent Contract" promulgated by the Committee. The "Standard Player Agent Contract" limits player agent fees by prohibiting any fee or commission on any contract which entitles the player to the minimum salary and by limiting agent fees on all contracts. Second, the Regulations contain a "code of conduct"

which specifically prohibits an agent from providing or offering money or anything of value to a player, a member of a player's family or a player's high school or college coach for the purpose of inducing the player to use that agent's services. *Id.* ¶ 11. The code also prohibits agents from engaging in conduct that constitutes an actual or apparent conflict of interest (such as serving as an agent for a player while also representing an NBA team, general manager or head coach), engaging in any unlawful conduct involving dishonesty, fraud, deceit, misrepresentation, or engaging in any other conduct that reflects adversely on his fitness to serve in a fiduciary capacity as a player agent or jeopardizes the effective representation of NBA players. *Id.; See* Regulations, Section 3B.

Third, the Regulations restrict the representation of players to individuals who are certified player agents, and set up a program for the certification of agents who are then bound by the Regulations' fee restrictions and code of conduct. Prospective player agents must file the "Applications for Certification as an NBPA Player Agent" with the Committee. The Committee is authorized to conduct any informal investigation that it deems appropriate to determine whether to issue certification and may deny certification to any applicant:

(1) Upon . . . determining that the applicant has made false or misleading statements of a material nature in the Application;

(2) Upon . . . determining that the applicant has ever misappropriated funds, or engaged in other specific fraud, which would render him unfit to serve in a fiduciary capacity on behalf of players;

(3) Upon . . . determining that the applicant has engaged in any other conduct that significantly impacts adversely on his credibility, integrity or competence to serve in a fiduciary capacity on behalf of players; or

(4) Upon . . . determining that the applicant is unwilling to swear or affirm that he will comply with these Regulations and any amendments thereto and that he will abide by the fee structure contained in the standard form player-

agent contract incorporated into these Regulations.

Regulations, Section 2C.

Any prospective agent whose application for certification is denied may appeal that denial by filing a timely demand for arbitration. Regulations, Section 2D. The arbitration procedure incorporates by reference the Voluntary Labor Arbitration Rules of the American Arbitration Association, and includes the right to be represented by counsel, to cross-examine the Committee's witnesses, to present testimonial and documentary evidence and to receive a transcript. Grantham Decl. ¶ 13, Regulations, Section 2D, Section 6E & F. The arbitrator is empowered to order certification if he determines, based on the evidence, that the Committee did not meet its burden of establishing a basis for denying certification. The arbitrator's decision is final and binding on all parties and is not subject to judicial review. The NBPA's selected arbitrator, George Nicolau, is experienced and highly qualified in handling labor relations in the sports industry. He is currently the chairman of the arbitration panel for the Major League Baseball and the Major League Baseball Players Association and the contract arbitrator for the Major Indoor Soccer League and Major Indoor Soccer League Players Association. The NBPA player representatives of each NBA team approved the Regulations which became effective on March 7, 1986. Regulations, Section 4C.

After unilaterally promulgating the Regulations, the NBPA obtained, in arms length collective bargaining, the NBA's agreement to prohibit all member teams from negotiating individual player salary contracts with any agent who was not certified by the NBPA. Grantham, Decl. ¶¶ 15, 17. Article XXXI of the NBPA–NBA Agreement provides:

Section 1. The NBA shall not approve any Player Contract between a player and a Team unless such player: (i) is represented in the negotiations with respect to such Player Contract by an agent or representative duly certified by the [NBPA] in accordance with the [NBA's] Agent Regulation Program and authorized to repre-

sent him; or (ii) acts on his own behalf in negotiating such Player Contract.

Section 2. The NBA shall impose a fine of $1,000 upon any Team that negotiates a Player Contract with an agent or representative not certified by the [NBPA] in accordance with the [NBPA's] Agent Regulation Program, if at the time of such negotiations, such Team either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NBA as to whether such agent or representative has been so certified.

Collins was an agent for several NBA players from 1974 until 1986. Collins applied for and received certification in 1986 soon after the Regulations took effect. In late 1986 or early 1987, he voluntarily ceased functioning as a player agent because of a lawsuit filed against him by a former NBA player client, Kareem Abdul–Jabbar, the former center of the Los Angeles Lakers, but retained his certification. Collins said he would not resume agent activities until he was exonerated of all charges in the pending lawsuit. In that case, Abdul–Jabbar, together with Ain Jeem, Inc. a corporation Abdul–Jabbar had established, alleged that Collins had committed numerous serious breaches of the fiduciary duty he owed as an agent to Abdul–Jabbar. *Id.* ¶ 20. The alleged breaches included mishandling of Abdul–Jabbar's federal and state income tax returns which caused Abdul–Jabbar to pay approximately $300,000 in interest charges and late penalties; improvidently investing Abdul–Jabbar's money; mismanaging Abdul–Jabbar's assets; and transferring funds from Abdul–Jabbar's accounts without permission to the accounts of other players who were also Collins' clients. *Id.* In 1988, Collins' certification was revoked because he failed to pay agent dues and failed to attend at least one agent seminar as required by the Regulations. Grantham Decl. ¶ 21.

Collins and Abdul–Jabbar settled the *Ain Jeem* lawsuit on November 7, 1989 and on February 15, 1990, Collins submitted an application to be recertified as a player agent. His application noted that there was still pending against him another lawsuit filed by another NBA player, Lucius Allen, and that

eight of his former player clients—Jabbar, Alex English, Lucius Allen, Rickey Sobers, Terry Cummings, Ralph Sampson, Rudy Hackett and Brad Davis—had discharged him by the end of 1986. Grantham Decl. ¶¶ 23, 24; Application, Collins Affidavit, Exhibit 4.

The Committee commenced an informal investigation into Collins' application, requested from him all pleadings in the Allen lawsuit against him, the *Ain Jeem* settlement agreement, and certain discovery documents from the *Ain Jeem* suit. Grantham Decl. ¶ 25. Collins replied that the Allen complaint had been inactive for three years (it was eventually dismissed) and that the *Ain Jeem* settlement was confidential. He provided the Committee with a redacted version that included only the confidentiality agreement and the following language: "As this dispute has been resolved without a trial, plaintiffs acknowledge that there has been no finding that defendants engaged in misrepresentation, misappropriation, conversion, breach of fiduciary duty or negligence." *Id.* The Committee received no further portion of the *Ain Jeem* settlement agreement or information regarding its terms from Abdul–Jabbar or his counsel. *Id.*

The Committee believed that its fiduciary duty to the players, who were prospective clients of Collins, required it to continue investigating the allegations against Collins to determine whether Collins had breached fiduciary responsibilities to Abdul–Jabbar or other NBPA members. Collins insisted that the quoted language of the settlement agreement and resulting dismissal of the *Ain Jeem* lawsuit, with prejudice, cleared him of all charges of breach of fiduciary responsibilities. He claimed, simultaneously with the settlement, Abdul–Jabbar had paid off a $300,000 bank loan that Collins had incurred. *Id.* ¶ 27. Abdul–Jabbar's counsel denied Collins' claim that Abdul–Jabbar had repaid a $300,000 bank loan that Collins had incurred, and provided the Committee with non-confidential discovery material from the *Ain Jeem* case relevant to the allegations that Collins breached his fiduciary duties as Abdul–Jabbar's agent. *Id.* ¶ 31. On July 6, 1990, the Committee sent Collins a letter referring to

that discovery material which listed questions concerning each of the allegations raised in that case. Collins responded by denying any wrongdoing and responding to the allegations. On September 6, the Committee granted Collins "interim certification" which allowed him to represent Terry Cummings while the Committee continued its investigation.

The Committee then conducted an informal investigatory hearing with both Collins and Abdul–Jabbar present to examine the conflicting information submitted by the two men. Id. ¶ 36. Although Collins could have had legal counsel present, the hearing took place on November 15, 1990, without counsel appearing for either Abdul–Jabbar or Collins. Id. ¶¶ 35, 36. By letter dated December 14, 1990, the Committee issued its decision denying Collins certification as a player agent. The letter explained that based on the allegations against him by Abdul–Jabbar and the information gathered by the Committee, the Committee concluded that Collins was unfit to serve in a fiduciary capacity on behalf of NBA players and that he made false or misleading statements to the Committee concerning a relevant subject in connection with the investigation into his application. Specifically, the Committee found: (1) Collins violated fiduciary duties to his former client Kareem Abdul–Jabbar and Ain Jeem, Inc. in his preparation and filing of federal and state tax returns, causing penalties and interest in excess of $300,000 to be imposed on Mr. Abdul–Jabbar and the corporation. (2) In handling the financial and business affairs of Mr. Abdul–Jabbar and other players, Collins acknowledged commingling funds from one account to another without authorization and resulting in losses of over $200,000 to Mr. Abdul–Jabbar. (3) Collins ignored requests by Mr. Abdul–Jabbar to invest money in safe investments, and invested in speculative ventures, many of which produced negative investment results. (4) In December 1985, Collins converted a corporate indebtedness of approximately $290,000 into a personal obligation of Mr. Abdul–Jabbar's without his approval. He also caused Mr. Abdul–Jabbar to execute loan documents relating to several investments making him jointly and severally liable

for repaying loans. (5) Collins told the Committee that he had not filed his own Federal income taxes for the four year period 1986 through 1989 (even though he admitted earning over $300,000 in 1986). (6) Collins falsely represented to the Committee that Mr. Abdul–Jabbar paid $300,000 of Collins indebtedness to the Bank of California in connection with settling a lawsuit filed by Mr. Abdul–Jabbar and Ain–Jeem against Collins. Id. ¶ 36; Collins Affidavit, Exhibit 20. The Committee had taken ten months to deny Collins' application—eight months longer than the NBPA's self established deadline.

The Committee informed Collins that under the Regulations he had a right to challenge the denial through final and binding arbitration. Soon after, Collins' counsel wrote to the Committee objecting that the November 15 hearing failed to provide Collins with appropriate process and that the failure to certify Collins violated the Sherman Act. The Committee responded that Collins could bring the case to arbitration at which the Committee would be obligated to establish through credible evidence that "Mr. Collins has engaged in conduct which would justify not recertifying him." Grantham Decl. ¶ 40. Collins did not demand arbitration. After the 30 day period for invoking arbitration under the Regulations had lapsed, Grantham informed Collins, by letter dated February 4, 1991 he no longer would be permitted to engage in any activities relating to salary negotiations on behalf of any NBA player. After waiving the right to challenge the NBPA action by arbitration, Collins brought this action challenging the Regulations, Article XXXI of the NBPA–NBA Agreement and their application to him.

Collins claims that the actions of the NBPA violate the Sherman Act and cannot be justified under labor exemptions. He claims the Defendants' actions create a group boycott against him and constitute a per se violation of the Sherman Act by restraining him from representing individual basketball players in salary negotiations with their teams. In effect, Collins contests the union's monopolization of the representation of basketball players in their negotiations with NBA teams. He further alleges that the

NBPA has waived any right to assert a labor exemption because it did not regulate Collins until 1986. Finally, Plaintiff alleges tortious interference with contracts and interference with prospective business advantage.

The NBPA Regulations and Article XXXI of the NBPA–NBA Agreement are exempt from antitrust law. Collins claims that the limitation of the market for the representation of basketball players is an antitrust violation. Although the Regulations do limit agents' representational ability, the identified "market" for the representation of NBA basketball players in salary negotiations is explicitly precluded by the federal labor laws. Were that market not exempt from the Sherman Act, then all collective bargaining by labor unions would be a violation of the antitrust laws, because in all collective bargaining other potential bargaining agents are entirely excluded from the relevant market. As the exclusive representative for all of the NBA players, the NBPA is legally entitled to forbid *any* other person or organization from negotiating for its members. Its right to exclude all others is central to the federal labor policy embodied in the NLRA. *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967). Indeed, the NLRA specifically empowers the exclusive bargaining representative to "monopolize" the representation of all employees in the bargaining unit. Section 9 provides:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. . . .

29 U.S.C. § 159(a). Under the NLRA the employer—the NBA member team—may not bargain with any agent other than one designated by the union and must bargain with the agent chosen by the union. *General Electric Co. v. NLRB*, 412 F.2d 512, 517 (2nd Cir.1969); *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 63–69, 95 S.Ct. 977, 985–88, 43 L.Ed.2d 12 (1975) (Union may forbid employees or any other agent chosen by individual employees, from bargaining separately with the employer over any issue). A union may delegate some of its exclusive representational authority on terms that serve union purposes, as the NBPA has done here. The decision whether, to what extent and to whom to delegate that authority lies solely with the union. *Morio v. North American Soccer League*, 501 F.Supp. 633, 640 (S.D.N.Y.1980), *aff'd*, 632 F.2d 217 (2nd Cir. 1980).

Collins argues that the Regulations establish a group boycott against him and are therefore a per se antitrust violation. He cites *Connell Const. Co., Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) as support. The case is inapposite. In *Connell*, the union imposed a group boycott against its *competition* by forcing a general contractor to agree to subcontract all of its work only to firms that employed union members. The Court held that the union's indiscriminant exclusion of non-union subcontractors from a portion of the market violated the antitrust laws. Unlike the Connell agreement, the Regulations do not establish a "group boycott" against Collins. A group boycott is a concerted refusal by traders to deal with other traders. *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959). Collins does not trade or compete with the NBPA, the NBA or the NBA member teams. His trade is dependent upon the professional basketball teams and players but he has no protected interest under the law. He is neither a competitor nor an employer.

The only market the Regulations affect is the market for the representation of players in their salary negotiations with the NBA member teams. The number and identity of the teams and of the players is unchanged by the Regulations. Competition among the teams for players is not affected by the Regulations. No competitor of the union or of any member team is excluded by the Regulations.

Collins asserts that the NBPA cannot properly negotiate all of the player salaries

without agents because negotiating the salaries of all of the players on an NBA team within the minimum salary and the team cap is an inherent conflict of interest and invalid. This situation is not qualitatively different from the common circumstances of a trade union representing employees with different pay scales in negotiating with their employer. Although the exact limits are more clearly defined in this case than in most industry bargaining situations, the available funds are always limited by economic forces. "The complete satisfaction of all who are represented is hardly to be expected." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) Union leadership must always choose among competing interests of the union's members. *See Humphrey v. Moore*, 375 U.S. 335, 350, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964) (no breach of fair representation to take position contrary to some of the interests of some of those union represents).

The statutory labor exemptions to the Sherman Act apply both to the NBPA's promulgation of the Regulations that govern agent certification and to the decision to include Article XXXI in the NBPA–NBA Agreement which precludes non-certified agents from representing players in individual salary negotiations making them immune from antitrust review. Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade," and Section 2 prohibits monopolies or conspiracies to monopolize trade. 15 U.S.C. §§ 1 & 2.

If the Sherman Act were strictly applied, the formation of a labor union as an exclusive bargaining representative would be proscribed. But the labor laws were enacted to allow workers to speak with one voice and to exert leverage over their employers. Congress enacted Sections 6 and 20 of the Clayton Act to exempt traditional labor activity from the antitrust laws. Section 6 states, in pertinent part:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, instituted for the purposes of mutual help ... or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17. Section 20 forbids federal court injunctions in any case involving a dispute concerning terms and conditions operation of employment and exempts specific union activities from the operation of antitrust laws. 29 U.S.C. § 52.

Union activity is further protected from antitrust scrutiny in the Norris–LaGuardia Act which restricts the power of federal courts to issue any injunction in a case growing out of a labor dispute, and forbids the issuance of any injunction "contrary to the public policy of the United States." 29 U.S.C. §§ 101 & 102. The term "labor dispute" includes any controversy concerning terms or conditions of employment regardless of whether the disputants stand in the proximate relation of employer and employee. 29 U.S.C. § 113(c). The Act declares that public policy approves of the efforts of workers to organize, designate representatives of their own choosing, and engage in concerted activities for collective bargaining or other mutual aid or protection. The NLRA expressly accords workers the right to organize, to bargain collectively through an exclusive representative and to engage in concerted actions, and forbids employers to interfere with those rights. 29 U.S.C. §§ 157, 158, 159, 163.

*United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), declared that the Sherman, Clayton and Norris–LaGuardia Acts must be harmonized when determining whether labor union activities violate antitrust legislation. "Conduct which [the labor laws] permit is not to be declared a violation of federal law." *Allen Bradley, Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945). The *Hutcheson* Court held that labor unions acting in their self interest and not in combination with non labor groups are exempt from Sherman Act liability. In

*Hutcheson,* a union struck, picketed and boycotted its employer in support of the union's claimed right to perform work given by the employer to a rival union. The Court noted that the union's activities were protected by § 20 of the Clayton Act and held that they did not violate the Sherman Act.

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under Section 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Hutcheson,* 312 U.S. at 232, 61 S.Ct. at 466.

■ The labor exemption is denied, and antitrust laws are applied to union agreements with one or more employers, when those agreements deny rival employers access to the market or expressly control wages for the purpose of destroying those rivals; that is, when unions "aid and abet businessmen who are violating the [Clayton] Act." P. Areeda and D. Turner, 2 *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 229e, at 202 (1978), *Allen Bradley,* 325 U.S. at 807, 65 S.Ct. at 1538. In *Allen Bradley* the Court held that a union had violated the Sherman Act when it combined with manufacturers and contractors to erect a sheltered local business market in order to "bar all other businessmen from [the market] and to charge the public prices above a competitive level." The labor exemption was denied because the union had not acted alone to further its own goals but had combined with businessmen who had complete power to eliminate all competition among themselves and prevent competition from other firms. Areeda and Turner, 2 *Antitrust Law* ¶ 229e, at 203.

■ Under *Hutcheson* and *Allen Bradley Co.,* a union's activities are entitled to the statutory labor exemption whenever they are covered by the Clayton and Norris–LaGuardia acts, and thereby in the union's legitimate self interest and not undertaken in combination with an employer, business or non labor group to restrain competition or control prices in the employer's or business group's

product market. *Hutcheson,* 312 U.S. at 232, 61 S.Ct. at 466. A union meeting this test is immune from liability under the antitrust laws even if its actions impose restraints on competition in the relevant product market.

■ Both the Regulations and Article XXXI are within the statutory exemption from antitrust regulation. When promulgating the Regulations and when negotiating Article XXXI, the NBPA acted in its own interest, independently of any employers and without denying access to rival employers. The number and identity of the employers remains unchanged regardless of the Regulations or Article XXXI. A union's actions are in its "self-interest" if they bear a reasonable relationship to a legitimate union interest. *Adams, Ray & Rosenberg v. William Morris Agency, Inc.,* 411 F.Supp. 403 (C.D.Cal.1976). The NBPA regulatory program fulfills legitimate union purposes and was the result of legitimate concerns: it protects the player wage scale by eliminating percentage fees where the agent does not achieve a result better than the collectively bargained minimum; it keeps agent fees generally to a reasonable and uniform level, prevents unlawful kickbacks, bribes, and fiduciary violations and protects the NBPA's interest in assuring that its role in representing professional basketball players is properly carried out. Although Collins claims any benefit is in the *player* self interest, not the union's, it is impossible to separate the two—the union is composed of its members and exists solely to serve the players. When the players benefit, the union benefits as well.

The second prong of the test is also met. Collins incorrectly claims that when enacting the Regulations, the NBPA combined with a non labor group and thus fails to earn a statutory exemption. The most analogous case is *H.A. Artists & Associates v. Actors' Equity Assn.,* 451 U.S. 704, 101 S.Ct. 2102, 68 L.Ed.2d 558, in which the Supreme Court upheld similar regulations against an antitrust challenge. In *H.A. Artists,* theatrical agents who represented members of Actors Equity Association for purposes of procuring employment and negotiating individual salaries above the collectively bargained minimum, challenged that union's licensing sys-

tem, which regulated the agents and required union members to employ only union-licensed agents. The Equity regulations, like the NBPA regulations at issue here, permitted only those agents who were licensed by the union to represent union members in individual salary negotiations with employers. The Equity regulations protected and sought to maximize wages by requiring agents to renounce any commission on any portion of a contract under which an actor or actress received no more than the collectively bargained minimum wages, and by limiting commissions in other respects. The Equity regulations also allowed actors to terminate their representation contracts with agents, and required agents to honor their fiduciary obligations. The Equity regulations were a response to historical abuses by agents, and were designed to secure better services from agents at lower rates.

The Court held that the Actors' Equity regulations met the *Hutcheson–Allen Bradley Co.* test for the statutory labor exemption. First, the Regulations were designed to promote the union's legitimate self-interest. *Id.* at 720–21, 101 S.Ct. at 2112. Second, there was no combination with either a non-labor group or a non-party to a labor dispute. The Court held there was no combination between the union and the employers—the theatrical producers—to create or maintain the regulation system. Rather, the union unilaterally developed the regulatory system in response to agent abuses and to benefit union members. *Id.* at 707, 101 S.Ct. at 2105. The Court concluded that although some agents agreed to the regulations, there was no combination with a non-labor group or persons who were not party to a labor dispute. The agents themselves were a labor group because they had an "economic interrelationship" with the union and its members "affecting legitimate union interests." That is, "the[y] represented[ed] ... union members in the sale of their labor ... [a function] that in most nonentertainment industries is performed exclusively by unions." *Id.* at 721, 101 S.Ct. at 2112. Thus, any dispute between the agents and the union regarding the representation of union workers was a "labor dispute"—which was outside of the purview of the antitrust laws. *Id.* at 721, 101 S.Ct. at 2112.

The NBPA Regulations similarly meet the second part of the *Hutcheson–Allen Bradley Co.* test. The NBPA did not combine with a non-labor group or a non-party to a labor dispute when promulgating the Regulations or negotiating Article XXXI. The NBPA unilaterally developed its Regulations in response to agent abuses and to benefit its members. It did not develop them in collusion with the employer group or to assist the employer group effort to restrain competition or control the employer group's product market.

Like the Equity agents, the player agents are a labor group. Although basketball players, unlike actors, can and do obtain employment without an agent, most players employ agents to negotiate their salaries and can fall victim to unscrupulous agent behavior. The player agents have a clear economic interrelationship with the players they represent; their remuneration is directly dependent on the relationship set up with the player and the salary obtained for him. Because they represent persons in the negotiation of terms of employment, the agents are clearly parties to a labor dispute within the meaning of the NLRA, 29 U.S.C. § 113(c). As such, they would meet the second prong of the test regardless of whether there is a combination with a non labor group.

Article XXXI of the NBPA–NBA Agreement also meets the second prong and is entitled to the statutory exemption. Article XXXI was obtained in arms length collective bargaining at the urging of the NBPA after it unilaterally promulgated the Regulations. It was not agreed to at the behest of or in combination with the NBA, the employer group. Regardless of Article XXXI, pursuant to § 9 of the NLRA, the NBA member teams may not negotiate salaries with anyone other than the NBPA without NBPA approval. It therefore follows that Article XXXI of the NBPA–NBA Agreement does little more than memorialize in explicit terms what the NBA member teams' legal duty would be under the NLRA: to deal only with the NBPA or agents specified by the NBPA. The provision adds no new requirements to

the NBA and thus creates no problem for the statutory exemption of the Regulations.

Article XXXI of the NBPA–NBA Agreement presents none of the concerns contained in the cases in which employer-union activities have been found to fall outside of the statutory exemption. Unlike *Allen Bradley*, the union activity is not designed to help employers control competition and prices. In fact, Article XXXI which requires teams to negotiate only with NBPA certified agents has no effect on the market for teams' services or on the market relating to any team. There is no combination with employer interests. With respect to the teams, the situation after the agreement is identical to the situation before it. The union serves its legitimate goals of protecting its representational function and the employer group's market is unchanged.

The agreement is similarly unlike the union-employer agreements in *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Connell Const. Co., Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). In *Pennington* the Court held that a union forfeits its antitrust exemption when it agrees with a group of employers to impose a wage scale on other bargaining units and thus conspires to curtail competition. 381 U.S. at 665–666, 85 S.Ct. at 1591. In *Pennington* the union-employer agreement fell outside of NLRA protection because the union and the employees could not, consistent with federal labor policy, bargain about wages, hours and working conditions of other bargaining units or the whole industry. *Id.* at 666, 85 S.Ct. at 1591. There is neither an employer conspiracy nor any effect on the employers' competitive position in the sports-entertainment market as a result of the NBPA–NBA Agreement. The union's regulation of its authorized representatives in the salary-bargaining process is protected by the NLRA.

In *Connell*, the union obtained an agreement from a general contractor whose workers the union did not represent, that the general contractor would subcontract work only to subcontractors who employed the union's members. In so doing, the union imposed a direct restraint on the market in which subcontractors could compete. 421 U.S. at 625–26, 95 S.Ct. at 1836–37. The Court held the agreement with the general contractor by which this restraint was imposed was not entitled to protection under the NLRA, because the union did not represent the general contractor's employees and had no right under the NLRA to bargain with their employer. *Id.* at 626, 95 S.Ct. at 1837. In this case, there is no restraint on the employers' market and there is NLRA protection for the union activity. Accordingly, both the Regulations and Article XXXI of the Agreement are immune from antitrust scrutiny under the statutory labor exemption.

Even if Article XXXI of the Agreement were not entitled to the statutory exemption, it would be immune from antitrust review under the nonstatutory exemption to the antitrust laws. The Supreme Court has determined that when a union-employer agreement falls within the protection of the national labor policy, a proper accommodation between the policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some agreements be accorded a limited nonstatutory labor exemption from antitrust sanctions. *Connell*, 421 U.S. at 622, 95 S.Ct. at 1835; *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1975). Unlike the statutory exemption which immunizes activities that are expressly described in the Clayton and Norris–LaGuardia Acts, the nonstatutory exemption immunizes labor arrangements that are the ordinary implication of activities contemplated by the federal labor laws. Areeda and Turner, 2 *Antitrust Law* ¶ 229a, at 192. When the agreement is reached through bona fide, arms-length bargaining between the union and the employers, and the terms of the agreement are not the product of an initiative by the employer group but were sought by the union in an effort to serve the legitimate interests of its members, it is free from antitrust scrutiny. *Jewel Tea*, 381 U.S. at 688–89, 85 S.Ct. at 1601; *Connell*, 421 U.S. at 622, 95 S.Ct. at 1835 (nonstatutory exemption denied because direct restraints on market imposed by union

outside of federally protected collective bargaining relationship).

In *Jewel Tea*, the butchers' union sought from the Jewel grocery store chain a provision—which it had already obtained from a multiemployer grocery association encompassing most other grocers in the area—restricting meat sales to limited weekday and Saturday hours. Jewel ultimately capitulated, agreeing to include the meat sale hours restriction in its contract with the union. The effect of the collective bargaining agreements was to limit competition among grocers. They were contractually committed not to sell meat after 6 P.M. or on Sunday. Because the union sought the marketing restriction to serve its members' concern of limiting working hours, an issue well within the terms and conditions of employment over which they were entitled to negotiate, the Court held that the union's efforts to obtain the restriction "through bona-fide, arm's length bargaining in pursuit of their own labor union policies, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." *Id.* at 689–90, 85 S.Ct. at 1601–02. The Court recognized that the agreements affected competition among employers but held that the NLRA allowed the union to negotiate those issues.

 The nonstatutory exemption similarly immunizes the Regulations from Sherman Act scrutiny. The Regulations were unilaterally developed in response to player complaints and to further NBPA labor policies. The NBPA–NBA Agreement, including Article XXXI, was agreed to in arms-length collective bargaining. The provision was not sought "at the behest of or in combination with" any employer or other non labor group as forbidden by *Jewel Tea.* There is no economic benefit to the NBPA or the NBA member teams as a result of this provision and there is no effect on the employer's product or service market as a result of the provision.

 Collins argues that even if the Regulations and Article XXXI would be entitled to the labor exemption to the antitrust laws, the NBPA has waived the right to invoke the exemption by failing to regulate agents until 1986. He further claims that the NBPA is estopped from refusing to certify him because he relied on the fact that he would be certified. This argument is frivolous. A representative body must be able to protect its members' interests whenever there is a risk of their being compromised, regardless of when that risk arises. When the NBPA learned of agent abuses it was not foreclosed from taking corrective action. Indeed, in its fiduciary role to its members, it was required to act in their best interest, which includes eliminating abusive forces. If the NBPA were precluded from acting then unions would be unable to change any of their policies and would be saddled by the practices and policies in place at the day of inception. Simply stating this proposition demonstrates its lack of merit.

 Equally ludicrous is Collins estoppel argument. Collins asserts that because he earned his living by representing NBPA members, he was entitled to rely on his assumption that he would continue in that function indefinitely. Accordingly, he contends that the NBPA is estopped from applying the Regulations to deny him certification. Collins had no assurances that the NBPA would not impose regulations or eliminate player agents entirely. The lack of regulation in the past was not an implied promise that there would be no regulation in the future. There were no promises, express or implied, by the NBPA that Collins had a tenured position as an agent.

 Collins argues that the Committee's use of Abdul–Jabbar's allegations against him is improper. He argues first, that the committee incorrectly accepted the allegations as true and second, even if they were true, that the allegations cannot be used in determining whether to certify him because they were unrelated to his work as a negotiator but related only to his work as an investment manager. The Committee's use of the allegations in deciding not to recertify Collins was certainly justified. By not appealing the Committee decision as directed by the Regulations, Collins forfeited the right to challenge the Committee's decision, the facts or the process. The court expresses no

opinion as to the accuracy of those allegations, but because they were not challenged, the Committee was entitled to treat them as true when deciding whether to certify Collins. The Committee's findings gave the Committee ample reason to deny certification under Section 2C of the Regulations. Contrary to Collins' suggestion, it is perfectly appropriate for the NBPA to question the integrity of those who will act as the agents and fiduciaries of its members in those areas which fall under union supervision.

Collins' argument that the claims of breach of fiduciary duty are unrelated to his appropriateness as a negotiating agent is flawed. The Regulations specifically give the Committee the power to deny certification to anyone who makes false or misleading statements to the Committee, who misappropriates funds, who acts in a way that impacts his credibility or who is unfit to serve as a fiduciary. It is beyond question that the Committee found Collins unfit under each of these criteria. Although Collins claims his alleged fiduciary violations are unrelated to his negotiating skills, he is wrong. The NBPA has the right to restrict delegation of bargaining authority to honest people.

Collins charges Defendants tortiously interfered with his contracts and intentionally interfered with his prospective business advantage. These claims are really no more than another challenge of the NBPA's right to exercise its representational monopoly. Neither of these state tort law claims states a proper cause of action. Colorado law provides that an interference with a contract or prospective business relation is tortious if, and only if, the interference is improper—*i.e.*, unjustified or not privileged. *See, e.g., Trimble v. City and County of Denver*, 697 P.2d 716, 726 (Colo.1985) (en banc); Restatement (Second) of Torts § 766 (1979). When determining whether a party has acted improperly, the court must consider the nature of the actor's conduct, his motive, the interests of the person with whom the actor interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the contractual interests of the other, the proximity or remoteness of the

actor's conduct to the interference and the relations between the parties. *Trimble*, 697 P.2d at 726; Restatement (Second) of Torts § 767 (1979). The NBPA's actions were justified and privileged under the Regulations. The NBPA's implementation of the Regulations, and their denial of Collins' certification application were to protect players from agent abuses. Because Collins chose not to challenge the Committee's findings, this court must accept them as true for purposes of this motion. Had Collins challenged the findings in arbitration, the method prescribed by the Regulations themselves, then he might have been able to have had some of the findings reversed. As it stands, all must be considered correct. If any one of the findings is true, the Committee was empowered to deny Collins certification under Section 2C of the Regulations. Such action was proper and justified. The Committee has a fiduciary obligation to the players. Certification of Collins would have breached that duty. The NBPA's conduct is by definition privileged. Therefore, Collins has no claim for tortious interference with contracts or prospective business relationship.

Upon the foregoing, it is

ORDERED that Defendants' motion for summary judgment is GRANTED and all of Plaintiff's claims are dismissed. Judgment will enter for the defendants, with costs to be awarded.